CROWN DRUG CO., INC., and Bolar
Pharmaceutical Co., Inc.,
Plaintiffs-Appellants,

v.

REVLON, INC., USV Pharmaceutical
Corp., and USV Laboratories, Inc.,
Defendants-Appellees.

No. 82–2256.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1983.

Decided March 22, 1983.

Robert B. Jones, Fitch, Even, Tabin, Flannery & Welsh, Chicago, Ill., for plaintiffs-appellants.

Marie V. Driscoll, Cooper, Dunham, Clark, Griffin & Moran, New York City, for defendants-appellees.

Before BAUER and WOOD, Circuit Judges, and VAN PELT,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This is an appeal from the district court's order dismissing Counts I, II and III of plaintiffs' complaint seeking a declaratory judgment that they did not violate the Lanham Act, the Illinois Deceptive Practices Act or the Illinois common law by selling a drug of the same color and dosage as one made and sold by the defendants; the district court summarily dismissed these counts for failure to state a justiciable controversy, noting that the plaintiffs had not demonstrated a reasonable apprehension of suit stemming from the conduct. The plaintiffs also appeal from the district court's dismissal of Counts IV through VIII of their complaint alleging that the defendants violated federal and state antitrust laws by extending their patent-created monopoly on the drug at issue through the maintenance of an apprehension of suit stemming from the plaintiffs' sale of the same drug. Because we agree that the plaintiffs failed to establish facts satisfying the threshold tests for a justiciable controversy or an antitrust violation, we affirm.

## I. Facts

The facts relevant to both the plaintiffs' declaratory judgment and antitrust counts may be summarized briefly. Defendant Revlon and its co-defendant subsidiaries (collectively, "Revlon") manufacture and sell chlorthalidone, a drug used in the treatment of hypertension. Revlon owned the original chlorthalidone patent, and even though that patent has now expired, Revlon retains a ninety percent market share in that product. Revlon's chlorthalidone tablets come in three colors, each corresponding to a different dosage level. Plaintiff Bolar has since 1981 also manufactured chlorthalidone tablets in the same color-dosage pattern as Revlon's. Fred Bondy, president of plaintiff Crown, was contacted in 1981 by Robert Shulman, president of Bolar, about the possibility of Crown acting as a distributor for Bolar's chlorthalidone. Bondy agreed to do so, but simultaneously expressed concern about possible lawsuits resulting from the identity of Revlon's and Bolar's tablets; consequently, Bolar indemnified Crown in connection with any such legal liability.

Shortly thereafter, Bondy aggressively followed up his legal concern by making several phone calls to Revlon to inquire

* The Honorable Robert Van Pelt, United States Senior District Judge for the District of Nebraska, is sitting by designation.

concerning the company's legal position on the sale of look-alike chlorthalidone. After internal referrals and uninformative responses, Bondy asked to speak to a lawyer and finally reached Mr. Lutz, a Revlon attorney, to whom Bondy put the question of Revlon's legal position. A concededly brief and amicable discussion followed. Bondy testified that he took notes "on what I felt was pertinent to my problem" in this conversation because he "felt litigation would result from this phone call."

Bondy's notes of that conversation, which form the sole basis for plaintiffs' invocation of declaratory judgment jurisdiction, paraphrase Lutz as saying,

> Our position reflects current legal status based on the jurisdictional reading. I guess our position would be we would go after the manufacturer. It would depend on many circumstances. I really don't know what we would do. Cutting into sales by X percent. There is a good likelihood that we go after them. If we felt identified by way of color, we might possibly go after them. The bottom line is have they hurt us because of color.

Bondy did not testify that Lutz ever threatened to initiate suit against Crown or Bolar, or that Lutz ever mentioned the Lanham Act, the Illinois Deceptive Practices Act, or the common law. And despite his confession that some of what Lutz said was "legal gobbledygook," Bondy nevertheless concluded that Revlon "would sue the manufacturer and probably the distributor" of look-alike drugs. Bondy emphasized especially Lutz's statement that the initiation of suit may depend on whether damage resulted to Revlon from the identical coloration of the rival product; Bondy testified that he believed there was "no question" that such damage would result.

In speaking with Bondy later, Shulman of Bolar did not solicit details of Bondy's conversation with Lutz; Bolar also never attempted to independently pursue the look-alike issue with Revlon. Neither Bolar nor Crown testified to any incidents of complaints or threats by Revlon to Bolar, Crown or any of their customers regarding the color duplication (indeed Crown had sold same-color chlorthalidone produced by another generic manufacturer for more than three years previous without any such complaint), nor did they indicate any knowledge of any lawsuits brought by Revlon against any *other* manufacturer in connection with the sale of look-alike drugs (in fact, the company had never taken such a course). Although pointing to Revlon's actions, Shulman and Bondy repeatedly emphasized that their fear of liability stemmed in large measure from their knowledge of *other* manufacturers' suits against *other* rival manufacturers in *other* drug lines. In addition, Crown testified that it had never contacted another manufacturer regarding its position on Crown's sale of identically colored drugs, even when it knew that in one case the product was a focus of litigation.

Based on the Lutz conversation and Revlon's subsequent failure to disavow Lutz's statements or give an affirmative promise not to sue Crown or Bolar over the sale of chlorthalidone, the plaintiffs sought declaratory relief from potential liability under the Lanham Act, the Illinois Deceptive Practices Act, and the Illinois common law of deceptive practices. The district court held that these counts posed no justiciable controversy since neither the Lutz colloquy nor other evidence indicated that Revlon had made any explicit or implied threat of suit, demand to cease manufacturing, or had taken other protective action, and since none of Bolar's customers expressed a reluctance to purchase its generic chlorthalidone tablets because of any action by Revlon. Since the antitrust claims in the latter five counts also rested entirely upon the Lutz conversation and Revlon's subsequent failure to promise legal non-action, and the court had already determined that those facts did not create a justifiable state of apprehension on the plaintiffs' part, the court subsequently dismissed the antitrust claims as well. Plaintiffs appeal both dismissals.

## II. *Declaratory Judgment*

The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the federal courts, in

their discretion, to render declaratory judgments only where there exists an "actual controversy"; the latter requirement is a "jurisdictional prerequisite of constitutional dimensions." *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979); *Tamari v. Bache and Co. (Lebanon) S.A.L.,* 565 F.2d 1194 (7th Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978). In reviewing the dismissal, we must determine whether the district court abused its discretion in its viewing of the evidence and consequent determination that no controversy existed. *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210 (7th Cir.1980).

■ As both parties have argued in their briefs, the proper threshold standard for determining whether a justiciable controversy exists in a declaratory action concerning unfair trade practices like those present here is the same as that articulated in the patent infringement cases: "The defendant must have engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face ... suit or the threat of one if it commences or continues the activity in question." *International Harvester,* 623 F.2d at 1210; *Premo Pharmaceutical Laboratories v. Pfizer, Inc.,* 212 U.S.P.Q. 681 (S.D.N.Y.1981). The focus of analysis must, however, rest upon the *defendant's* statements or conduct; a "reasonable apprehension alone, if not inspired by defendant's actions, does not give rise to an actual controversy." *International Harvester,* 623 F.2d at 1211.

■ We agree with the district court that the relevant evidence failed to establish that the acts of Revlon could have caused a "reasonable" apprehension of legal action. The plaintiffs rely on Bondy's stilted record of a conversation which he initiated with Lutz, a lawyer for Revlon, and Revlon's subsequent failure to comment upon those statements or make further legal pronouncements. Even accepting at face value Bondy's notes of that conversation, however, we simply cannot see how those notes reveal an explicit or implied threat of suit. Lutz's language comprises a carefully hedged, abstract discussion of a legal issue in purely hypothetical fashion; the use of phrases such as, "I guess our position would be ...," "It would depend on many circumstances ...," "... we might possibly ...," and "I really don't know what we would do," to describe Lutz's view of a possible position towards an unspecified manufacturer hardly connotes an intent to create a positive, let alone forceful, impression that suit against Crown or Bolar was imminent. The plaintiffs place emphasis on Lutz's purported statement that the "bottom line" is whether a rival manufacturer has "hurt us" because of color, but it is clear from the context of the discussion and Lutz's lack of knowledge of Crown and Bolar's market efficacy that this was merely the listing of a factor considered important in the abstract. Especially in view of the fact that the plaintiffs initiated the sole contacts with Revlon, and in view of the innocuousness of Lutz's remarks, we also cannot find that Revlon's subsequent failure to assert that it would not sue the plaintiffs gave rise to a reasonable apprehension of suit.

Indeed, this court and others have refused to find a justiciable controversy in circumstances far more suggestive of imminent legal action than those present here. In *American Needle and Novelty Co. v. Schuessler Knitting Mills, Inc.,* 379 F.2d 376, 379 (7th Cir.1967), for example, the plaintiff received a formal letter from the defendant's attorney stating that the plaintiff's product "may conflict" with defendant's patent since it was purportedly very similar in appearance; the letter further noted that others in the plaintiff's position had taken licenses from the defendant, and it asked the plaintiff to submit a sample of the product for the defendant's inspection. On appeal, the refusal of jurisdiction was held valid since the facts revealed that no formal or informal charge or threat had been made. *Id.* at 379. Similarly, no "reasonable apprehension" of suit was found in *American Cyanamid Co. v. Ethicon, Inc.,* 443 F.Supp. 46, 49 (S.D.N.Y.1977), even where the defendant's employee noted that

the defendant had spent many years in developing the product at issue, and warned the plaintiff to "look out" as the defendant "probably would" sue the plaintiff. The court noted that, despite the strong language used, the defendant's statements responded to a "hypothetical question . . . and cannot be considered more than a conjectural response." *Id.* at 50. These conclusions should *a fortiori* control where, as here, the defendant's spokesman did not even address himself to the particular activities of the plaintiff but instead stated his views of a hypothetical case.

Other factors beyond Bondy's record of Lutz's statements convince us that no justiciable controversy existed at the time of suit. In determining whether apprehension of suit is "reasonable" under the circumstances, for example, the courts have expressed enhanced skepticism toward such claims where, as here, the plaintiff initiated the discussion at issue. As this court noted in *International Harvester,* the plaintiff "initiated communication with regard to the [product] and, indeed, was first to suggest that its design might raise a question of infringement. We have found no case in which plaintiff demanded patent clearance from a competitor and was able to rely upon the refusal to grant it as a basis for its reasonable apprehension." *International Harvester,* 623 F.2d at 1212. *Accord American Cyanamid,* 443 F.Supp. at 50. Indeed, apprehension of suit following a plaintiff-initiated discussion has been held unreasonable even where the plaintiff, unlike here, had prefaced the conversation with a statement that its outcome would be dispositive of the plaintiff's decision whether to file a preemptory suit seeking declaratory relief; here, by contrast, Lutz had no such warning of the conversation's practical significance. *International Harvester,* 623 F.2d at 1212. In short, to conclude that there existed a "reasonable apprehension" of suit here we "would have to ignore both the circumstances surrounding the conversation reported and the logical meaning of the statements alleged to have been made." *American Cyanamid,* 443 F.Supp. at 49.

In assessing whether the defendant's statements gave rise to a reasonable apprehension of suit, courts have also examined the previous history of litigation between the parties. For example, in *Premo Pharmaceutical Laboratories v. Pfizer, Inc.,* 212 U.S.P.Q. 681 (S.D.N.Y.1981), cited by the plaintiffs, the court based its finding of "reasonable apprehension" in part upon the defendant's conduct in initiating two suits against the plaintiff within the previous year based on similar product claims. *Id.* at 68. Indeed, often even where the defendant *had* sued the plaintiff over similar product-imitation claims, the court has refused to find "reasonable" apprehension. *See, e.g., International Harvester,* 623 F.2d at 1212; *American Cyanamid,* 443 F.Supp. at 50. Accordingly, we consider it significant that the plaintiffs here failed to identify a single instance in which the defendants complained, threatened to sue, or even contacted the plaintiffs or any other manufacturers about the sale and purchase of chlorthalidone look-alikes, or, indeed, any other generic drug imitating a Revlon product. Significantly, Crown had sold look-alike generic chlorthalidone for three years previous to the instant suit, a period during which litigation based upon the sale of generic look-alikes was widely reported, without any word of complaint from Revlon. The plaintiffs submit that one Bolar customer declined to carry Bolar's chlorthalidone because of the possibility of legal liability stemming from their imitative coloring, but there was no evidence that it refused to do so because of complaints or threats *from Revlon.* Since we must measure the reasonableness of the plaintiff's apprehension only by the acts of the defendants, that customer's hesitation is irrelevant to the inquiry.

In sum, none of the traditional legal indicia of "reasonable apprehension"—positive or threatening language in contacts initiated by the defendant, or a background of litigation between the parties—are present here. Apparently recognizing the inhospitability of these indicia to their claim, the plaintiffs at oral argument reversed the position taken in their brief and argued

that the declaratory judgment cases involving patents, such as *International Harvester* and *American Needle,* are inapplicable to the case at bar. Plaintiffs chiefly argue that these cases rest on the narrow premise that a defendant patent-holder's hesitation to declare the plaintiff free from suit may be justifiable since complex threshold questions such as actual "infringement" are involved, but that such a premise is not justified here since a suit based on unfair trade practices need not be based on any such complex predicate determination by the defendant. We must reject this argument for two reasons.

■ First, it is by no means apparent that no interval may be due a defendant to determine whether the plaintiff's practices are actionable under deceptive practices or fair trade law. The Lanham Act, for example, requires an affirmative showing of damage to the original manufacturer stemming from the imitative packaging of the rival manufacturer's product, a complicated and rigorously scrutinized jurisdictional requirement, *see, e.g., John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 325 (D.C.Pa. 1976), *rev'd in part on other gds.,* 587 F.2d 602; *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 648, 649 (3d Cir.1958). Bondy's conclusory assertion that there was "no question" that legally actionable damage would result to Revlon from Crown's chlorthalidone sales hardly suggests that Revlon should be held to a similar snap judgment.

■ Second, the defendants' proffered distinction of the patent cases does not explain their refusal to find "reasonable" apprehension of suit even where defendants did not merely ask for time to mull over the question of infringement, but also warned plaintiffs to "look out" or strongly hinted that an infringement had already occurred. *See, e.g., American Needle,* 379 F.2d at 379; *American Cyanamid,* 443 F.Supp. at 49, 50. We believe that the practical strategic realities of patent infringement and fair trade product-imitation litigation are not so dissimilar as to preclude analogizing declaratory judgment threshold principles from the

former to the latter. *Premo Pharmaceutical Laboratories v. Pfizer, Inc.,* 212 U.S.P.Q. 681 (S.D.N.Y.1981).

The plaintiffs finally argue that, even accepting the patent infringement analogy, the district court failed to consider the enhanced solicitude accorded to imitating competitors seeking declaratory judgment where, as here, the company has already commenced, rather than simply proposed, production and distribution, citing *Super Products Corp. v. D.P. Way Corp.,* 546 F.2d 748 (7th Cir.1976); *Societe de Conditionnement v. Hunter Engineering,* 655 F.2d 938 (9th Cir.1981). However, the fact that production had commenced was a comparatively minor factor in those cases; far more important were the findings that the defendants had made, and refused to withdraw, unqualified and explicit threats of litigation. *See Super Products,* 546 F.2d at 753–54; *Societe de Conditionnement,* 655 F.2d at 941, 944. Even the most liberal reading of those cases could not transform Lutz's armchair discussion into an explicit or implied threat of litigation. Accordingly, we hold, Revlon's actions could not have served as the basis for a "reasonable apprehension" of suit, and, accordingly, no justiciable controversy was posed by Counts I, II and III.

### III. The Antitrust Counts

■ The plaintiffs' antitrust counts, IV through VIII, charged that Revlon had unlawfully maintained its ninety percent monopoly in chlorthalidone through the creation of an apprehension of deceptive practices litigation against rival manufacturers. The sole basis for this supposed apprehension was the conversation between Lutz and Bondy, as discussed above, and Revlon's subsequent failure to repudiate that discussion. However, like the district court, we find that the failure of plaintiffs to establish that there existed an objectively reasonable apprehension of litigation based on any of the defendant's actions eliminated the basis for its monopolization claims. Summary resolution of antitrust claims is especially welcome where, as here, the key allegation of the complaint is demonstrably

unsupportable. *Lupia v. Stella d'Oro Biscuit Co., Inc.,* 586 F.2d 1163 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). The district court properly dismissed the plaintiffs' antitrust counts.

AFFIRMED.