**The STATE OF TEXAS,**
**Plaintiff–Appellant,**

v.

**WEST PUBLISHING COMPANY,**
**Defendant–Appellee.**

**No. 88–1114.**

United States Court of Appeals,
Fifth Circuit.

Sept. 5, 1989.

---

Donna L. Nelson, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for plaintiff-appellant.

Linda L. Holstein, Vance R. Opperman, Ray Oechsler, Opperman & Paquin, Minneapolis, Minn., J. Hampton Skelton, Austin, Tex., Michael Lowenberg, Kathleen M. LaValle, Dallas, Tex., for defendant-appellee.

Before WISDOM, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant the State of Texas (Texas) appeals the district court's dismissal of its suit against defendant-appellee West Publishing Company (West) seeking declaratory judgment that West's copyright in West's arrangement of Texas statutes is invalid. 681 F.Supp. 1228. The district court dismissed the suit for lack of subject matter jurisdiction after concluding

that the action did not present an "actual controversy." We affirm.

### Facts and Proceedings Below

For several decades Texas and West have enjoyed an amicable publishing relationship. Since 1914, West and its predecessor, Vernon Law Book Company, have collected, arranged, and published Texas statutory law in *Vernon's Annotated Texas Statutes*. In 1925 the Texas Legislature reorganized all laws in effect at that time into three major divisions: civil statutes, criminal statutes, and criminal procedure statutes.[1] The civil statutes comprised a two-volume set known as the "Revised Civil Statutes." The focus of this litigation is West' annotated version of the Revised Civil Statutes, known as *Vernon's Annotated Revised Civil Statutes* (Vernon's). Tex.Rev.Civ.Stat.Ann. (Vernon 1962).

Defying the legislative process, the 1925 statutory classification scheme did not provide for expansion of the law through the addition of new laws. Subsequent changes or additions to Texas law, which were not given a placement designation by the legislature, were reviewed by West and then arranged by West for appropriate placement within Vernon's. *See Johnson v. City of Fort Worth*, 774 S.W.2d 653 (1989 Tex.) (providing a useful discussion on the codification process).[2] West identified such new statutes—as to which the legislature

---

1. Each of the major divisions is broken down by subject matter titles. The 1925 arrangement consisted of 131 numbered titles arranged in alphabetical order. Since 1925, eighteen new titles have been added to the Revised Civil Statutes and eight titles have been abolished. The titles are subdivided by article numbers, beginning with Article 1 and ending with Article 9204. If it is necessary, the Articles are then divided into sections.

2. In *Johnson v. City of Fort Worth*, the Texas Supreme Court considered whether section 16.061 of the Civil Practice and Remedies Code prevented section 16.008 of that code from acting as a bar to the defendant-City's claim for contribution from the co-defendant architect. *Johnson*, 774 S.W.2d at 654. Section 16.061 provides that a city's right of action is not barred by several sections of the Code. Section 16.008 was not listed in section 16.061, but the City claimed that section 16.061 was intended as

a nonsubstantive change of its predecessor statute, article 5517, and that article 5517 did bar section 16.008 from operating against the City.

Article 5517, adopted as part of the 1925 Revised Statutes, was included in "Title 91. Limitations." Revised Statutes, sec. 1, art. 5517, 39th Leg., 1925 Tex.Rev.Civ.Stat. 2, 1555, *amended by* Act of Apr. 6, 1939, tit. Limitations, ch. 1, 46th Leg., 1939 Tex.Gen.Laws 485, *amended by* Act of May 19, 1953, ch. 348, 53d Leg., 1953 Tex.Gen.Laws 857, *repealed by* Civil Practice and Remedies Code, ch. 959, sec. 9(1), 69th Leg., 1985 Tex.Gen.Laws 3242, 3322 (currently codified as Tex.Civ.Prac. & Rem.Code Ann. § 16.061 (Vernon 1988)). Section 16.008's predecessor was passed by the legislature in 1969. The legislature did not designate placement within the statutes, so West assigned "article 5536a" to the 1969 enactment, *see Johnson*, 774 S.W.2d at 655, "seemingly placing it within Title 91." *Id.* at 655.

had made no placement designation—by a 1925 article or section number that was coupled with a West-generated identifier.[3] The result of West's efforts was Vernon's —an up-to-date, readily accessible version of Texas' civil statutes. *See id.* at 655. West claims a copyright in the Vernon's arrangement. West does not claim a copyright in the text of the statutes themselves or in any official compilation or other arrangement of Texas statutes.[4]

Texas publishes legislation enacted subsequent to the 1925 Revision in the General and Special Laws of Texas. These official session laws are printed in chronological order after each legislative biennium. West claims no copyright in any of these. The printing of the session laws is done by the successful commercial bidder. From 1941 to 1985, West was the successful bidder. In 1985, the seeds of discontent between the parties were apparently sown when the bid contract was awarded to the Bancroft–Whitney Company.

In 1985, Bancroft–Whitney brought a declaratory judgment action in Texas against West to have West's alleged copyright declared invalid.[5] West counterclaimed for copyright infringement. The case was removed to a federal district court in Minnesota, where it is still undecided. In the 1987 Texas legislative session, SB 664 was introduced into the legislature. The bill provided for Texas' official "adoption" of the Vernon's arrangement.[6] West and Bancroft–Whitney lobbied intensively for their respective positions, with West the ultimate victor. In the fall of 1987, after the defeat of SB 664, Texas filed the present declaratory judgment action under 28 U.S.C. § 2201 against West to have West's copyright declared invalid. West

The Texas Supreme Court found that the West-supplied number "cannot have the force of law," and the court found "nothing in the language or history of this enactment to suggest that article 5536a, now section 16.008, was to have been encompassed within the provisions of article 5517, now section 16.061." *Id.*

3. For example, Title 116 deals with "Roads, Bridges, and Ferries." The 1925 version of Article 6701, contained within Title 116, covered the "Width of Wheels." Article 6701a was added by the legislature in 1929 and concerns "Permits for Heavy Trucks on Highways," Article 6701a–1 was added in 1935, Article 6701a–2 in 1981 and Article 6701a–3 in 1985. So many additions to the single paragraph provision known in 1925 as Article 6701 have occurred that currently Articles 6701d through 6701m–2 encompass an entire Vernon's volume plus a 145–page pocket part.

4. In 1963, the Texas legislature began a major revision of the 1925 Texas statutory classification scheme. The recodification is ongoing and is now over half complete. The new scheme groups the statutes by topical code, such as the "Business and Commerce Code." As each new code is enacted by the legislature, the earlier statutes dealing with these subject matters in the Revised Civil Statutes are repealed. West does not claim a copyright in Texas' arrangement of the new codes.

5. The core of the Bancroft–Whitney and West litigation does not involve the printing contract; rather, the conflict revolves around Bancroft–Whitney's purported plans to market an electronic version of the Texas Code Service (TCS).

TCS would contain the Vernon's arrangements that are allegedly subject to West's copyright. A user of the TCS would be able to access Vernon's without ever having to refer to or purchase a Vernon's volume. In many ways, the Bancroft–Whitney litigation appears to be analagous to the Mead Data and West litigation.

In *West Publishing Co. v. Mead Data Central, Inc.,* 616 F.Supp. 1571 (D.Minn.1985), *aff'd,* 799 F.2d 1219 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987), West sued Mead Data for Mead Data's infringement of their copyright in the numbering and pagination of the Federal Reporter System. Mead Data was attempting to provide its LEXIS users with "star" pagination, which would allow the user to obtain the page number in the Federal Reporter System without ever having to refer to or purchase a Federal Reporter volume. Prior to a decision on the merits, the parties settled their dispute.

While the Bancroft–Whitney and Mead Data cases contain similarities, the Mead Data case is irrelevant to our decision because it has nothing to do with the subject matter of this case— West's copyright in an arrangement of Texas' statutory laws. In addition, we do not consider the aggressive posture that West takes with its private publisher competitors as indicative of an aggressive stance towards a noncompetitor such as Texas.

6. For an interesting discussion of the government's "taking" of copyrighted property under its eminent domain power, see Roberta Rosenthal Kwall, *Governmental Use of Copyrighted Property: The Sovereign's Prerogative,* 67 Texas L.Rev. 685 (1989).

moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The district court dismissed pursuant to 12(b)(1) after concluding that subject matter jurisdiction was lacking under the Declaratory Judgment Act, 28 U.S.C. § 2201, because the suit did not present an actual controversy. Texas now appeals that ruling.

## Discussion

■ The district court lacks subject matter jurisdiction to issue a declaratory judgment unless an "actual controversy" exists between Texas and West. 28 U.S.C. § 2201(a); *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir.1986). It has been said that the case or controversy requirement of Article III of the United States Constitution is identical to the actual controversy requirement under the Declaratory Judgment Act. *Windsurfing Int'l, Inc. v. AMF, Inc.*, 828 F.2d 755, 757 (Fed.Cir.1987). We have stated that an actual controversy is one where "a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests." *Middle South*, 800 F.2d at 490 (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *Johnson v. Onion*, 761 F.2d 224, 225 (5th Cir.1985)). Texas bears the burden of establishing an actual controversy and Texas must prove by a preponderance of the evidence that a controversy exists. *Id.* at 490.

■ While the basic declaratory judgment principles are well settled, we have not had the opportunity to apply them in the context of an intellectual property case. We are not without guidance, however, because the Federal Circuit provides a wealth of precedent in the intellectual property field and it has articulated fairly clear standards. According to Federal Circuit decisions, an "actual controversy" exists in an intellectual property case when both prongs of a two-pronged test are satisfied —(1) when the declaratory plaintiff has a real and reasonable apprehension of litiga-

tion and (2) when the declaratory plaintiff has engaged in a course of conduct that brings it into adversarial conflict with the declaratory defendant. *See, e.g., Windsurfing Int'l*, 828 F.2d at 757 (case involving patents); *Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879, 883 (Fed.Cir.1985), *cert. denied*, 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986) (case involving trademarks).

■ We hold that neither prong of this test has been adequately satisfied.[7]

## I. Texas Adversarial Activity

■ Texas engages in limited noncommercial publishing for its own intragovernmental use of pamphlets that contain portions of the Vernon's arrangement. Texas asserts that this activity satisfies the threshold requirement of an "adversarial conflict." In a Federal Circuit case involving patents, the court stated that in order to establish an adversarial conflict "the plaintiff must have either produced the device or have prepared to produce that device." *Goodyear Tire & Rubber v. Releasomers*, 824 F.2d 953, 955 (Fed.Cir.1987); *see also Windsurfing Int'l*, 828 F.2d at 758 (finding that absent use of the trademark there could not be adverse legal interests between the parties). Applying these principles in the copyright context, the plaintiff must show that it has actually published or is preparing to publish the material that is subject to the defendant's copyright and that such publication places the parties in a legally adverse position.

There is no evidence that Texas has in the past, is currently, or intends in the future to engage in any commercial publishing of Vernon's. Texas' limited noncommercial publication of pamphlets for its own intragovernmental use is not an activity that is legally adverse to West. On the contrary, the record reveals that this limited noncommercial publishing has occurred for years without any conflict of any kind between the parties. Texas is simply not a competitor of West and it is not engaged in

---

**7.** Hence we need not determine whether both prongs must be satisfied or whether in certain circumstances establishing one prong and some substitute for the other would suffice.

any publishing activity that places it in adversarial conflict with West.

Texas cannot satisfy the adversarial conflict requirement by stating that one day *it might* want to compete with West in the commercial publication of the Vernon's arrangement. This imaginary conflict is even more remote than the "conflicts" rejected in the case law where the parties were at least business competitors. *See, e.g., Windsurfing Int'l,* 828 F.2d at 758 (stating that the plaintiff's asserted desire to use the trademark, rather than actually using it, is insufficient to establish a conflict); *Polaroid Corp. v. Berkey Photo, Inc.,* 425 F.Supp. 605, 609 (D.Del.1976) (finding that plaintiff did not present a legally adverse conflict by "contemplating" use of the defendant's trademark). As one court so aptly put it, this conflict "smacks too much of the hypothetical and contingent." *Windsurfing Int'l,* 828 F.2d at 758 (quoting *Wembley, Inc. v. Superba Cravats, Inc.,* 315 F.2d 87, 90 (2d Cir.1963).

## II. *Threats Emanating from West*

 Moreover, no conduct on the part of West is shown that supports Texas' asserted fear of litigation. To rely on fear of litigation, Texas must establish conduct by West which supports that asserted fear. *Crown Drug Co. v. Revlon, Inc.,* 703 F.2d 240, 243 (7th Cir.1983). The focus here is on the defendant's conduct that is directed toward the plaintiff. *Id.* Traditional indicia of an objectively reasonable fear of litigation are direct threats by the defendant or a history of litigation between the parties. *Id.* at 243–44. While express or direct threats by the defendant are not essential to establish a plaintiff's reasonable fear of litigation, the plaintiff must allege a course of conduct that implies an "imminent threat of impending legal action" by the defendant. *Id.; see also Goodyear,* 824 F.2d at 956. A defendant's simple assertion that they hold a copyright in certain material generally does not amount to a

threat of litigation. *See International Medical Prosthetics Research Assocs. v. Gore Enters. Holdings, Inc.,* 787 F.2d 572, 576 (Fed.Cir.1986).

Texas asserts that the "threats" emanating from West are: (1) West's 1985 counterclaim against the private publisher, Bancroft–Whitney, (2) West's vigorous lobbying to defeat SB 644 in 1987, and (3) a letter to a Texas representative that allegedly "infers" a threat by West to sue Texas. The last "threat" is a letter *from* the Attorney General of Texas to a member of the Texas House of Representatives regarding the legal ramifications of SB 644.[8] West had absolutely nothing to do with the letter and as such it is inconceivable that it is a threat emanating from West.

West did lobby aggressively against SB 644. That proposed legislation did not pass, and the legislative session at which it was introduced had terminated when this suit was filed. West's lobbying against previously proposed Texas legislation does not translate into a threat of suit against the State of Texas. In fact, the record reveals that West's "lobbying" efforts were directly pointed at Bancroft–Whitney, not the State of Texas. There is a constitutional right to vigorously express opinion on proposed legislation—West and Bancroft–Whitney were merely exercising this right. While West's lobbying indicates that West takes its Vernon's copyright seriously, it reveals nothing about West's intentions to sue Texas for copyright infringement.

The only cognizable "threat" emanating from West is West's counterclaim in the Bancroft–Whitney litigation. In *Indium Corporation,* the Federal Circuit found that the defendant's suits against unconnected third parties did not support a reasonable fear of litigation against the plaintiff. 781 F.2d 879, 883 (Fed.Cir.1985). Without some other concrete evidence of discord between these parties, Texas can-

---

8. The letter, dated May 15, 1987, was written by Attorney General Jim Mattox in response to a question by Representative James F. Hury, Jr. Representative Hury had asked whether West would have a copyright infringement claim against the State of Texas if SB 644 was enacted. The letter presents the Attorney General's view on the status of West's copyright claim and the possibility of litigation.

not place itself into an adverse position with West by relying on an asserted indirect, implied threat by West supposedly arising from the Bancroft–Whitney litigation. *See Goodyear*, 824 F.2d at 956 (finding that an express threat against plaintiff is not required where same parties were involved in other suits regarding the same technology); *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 504 (2d Cir. 1968) (finding that years of strife between the same parties and numerous patent proceedings supported finding of an actual controversy absent a direct threat by defendant against plaintiff.) [9]

Texas also asserts that West can not hold a copyright in the Vernon's arrangement because Vernon's is the only "accessible" version of Texas statutory law. Texas argues that it has an obligation under the due process clause to provide its residents with access to its laws and that West's copyright impinges on this obligation. This argument is without merit. Texas residents have ready access to the General and Special Laws of Texas, which are published after each legislative session. Also, over half of Texas statutory law has already been arranged under the 1963 recodification process and West does not claim a copyright in this arrangement. Finally, there is no evidence that anyone is being denied access to Vernon's or that West intends to deny access in the future. Accordingly, Texas residents are not being deprived of any due process right they could conceivably have to access Texas laws.

### III. Texas' Alternative Claims

■ Texas also asserts alternative claims based upon joint ownership and work-for-hire theories. These claims are so intertwined with the primary claim that they expressly depend upon the prior adjudication of the validity of West's copyright in Vernon's. We cannot reach the issue of the copyright's validity because there is not an actual controversy between these parties. Texas cannot bootstrap itself into a decision on the validity claim by asserting secondary claims that necessarily depend on the resolution of the primary claim. *See Windsurfing Int'l*, 828 F.2d at 756, 759; *Techniques, Inc. v. Rohn*, 592 F.Supp. 1195, 1198 (S.D.N.Y.1984). Such pleading stratagems only serve to undermine the actual controversy requirement of Article III of the Constitution as it applies to declaratory judgments.

Our decision in *Goodman v. Lee*, 815 F.2d 1030 (5th Cir.1987), is not to the contrary. In that joint-ownership case, the co-author of a song wished to receive royalties under a specific copyright that was listed solely in the other author's name. Both parties agreed that the copyright was *per se* valid and enforceable. *Id.* at 1031. Here, Texas alleges in its complaint that West's copyright is wholly invalid, but that *if* the copyright is valid, then Texas would be a joint owner with West.[10] Clearly, what Texas is disputing is the validity of the copyright. We cannot reach the primary issue, so necessarily, the secondary issues are beyond our reach.

---

**9.** The cases that Texas asserts are "directly on point" do not aid their position. In *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874 (Fed.Cir.1983), there was clear discord between the parties as the plaintiff had already been sued by the defendant in state court for recovery of royalties under their patent licensing agreement. *Id.* at 881. In *United Christian Scientists v. Christian Science Board of Directors, First Church of Christ, Scientist*, 829 F.2d 1152 (D.C.1987), the plaintiff challenged the constitutionality of the defendant's copyright. Plaintiff was a publishing competitor of the defendant and there had been prior copyright disputes between the parties. *Id.* at 1156. In *Societe de Conditionnement v. Hunter Engineering*, 655 F.2d 938 (9th Cir.1981), the parties were business competitors who were actively engaged in manufacturing

the product that allegedly infringed the defendant's patent. *Id.* at 944. In the present case there is no evidence of past discord between Texas and West and Texas is not, by any stretch of the imagination, engaged in publishing Vernon's.

**10.** The purely hypothetical and contingent nature of Texas' joint ownership claim, absent a finding of copyright validity, is illustrated by the judgment we would have to render if we decided Texas' secondary claim. Such a judgment would state something to the effect that "Texas is [is not] a joint owner with West of any copyright West holds in Vernon's, *if* West holds any such copyright."

### Conclusion

In the present case, we agree with the district court that Texas has failed to prove any conduct that satisfies the requirements for an "actual controversy" in an intellectual property declaratory judgment case. Accordingly, the judgment below is

AFFIRMED.