357 F.3d 441
 WHAT-A-BURGER OF VIRGINIA, INCORPORATED; Jack Branch; What-A-Burger of Newport News, Incorporated; Paul Branch, Plaintiffs-Appellees,
v.
WHATABURGER, INCORPORATED OF CORPUS CHRISTI, TEXAS, Defendant-Appellant.
 No. 03-1517.
 United States Court of Appeals, Fourth Circuit.
 Argued: October 29, 2003.
 Decided: February 11, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: Hubert Adair Crouch, III, Crouch & Inabnett, L.L.P., Dallas, Texas, for Appellant. Melvin J. Radin, Norfolk, Virginia, for Appellees. ON BRIEF: Stephen E. Story, Shepherd D. Wainger, Kristan B. Burch, Kaufman & Canoles, P.C., Norfolk, Virginia, for Appellant.
 Before WILKINS, Chief Judge, and TRAXLER and DUNCAN, Circuit Judges.
 Affirmed in part, reversed in part, and remanded by published opinion. Judge TRAXLER wrote the opinion in which Judge WILKINS and Judge DUNCAN joined.
 OPINION
 TRAXLER, Circuit Judge:
 
 
 1
 This appeal presents a dispute between two hamburger restaurant chains operating under similar versions of the name WHATABURGER®, a federally-registered trademark. Appellant Whataburger, Inc., of Corpus Christi, Texas ("Texas WAB"), a Texas corporation with "Whataburger" franchises throughout the southern United States and Mexico, holds the exclusive right to use the registered WHATA-BURGER® trademark. Appellee What-A-Burger of Virginia, Inc. ("Virginia W-A-B") operates its "What-A-Burger" restaurants solely in Virginia. Texas WAB appeals the district court's order denying its motion for summary judgment and granting summary judgment sua sponte to Virginia W-A-B on the basis that Texas WAB was barred by the equitable doctrines of laches and acquiescence from enforcing in Virginia its exclusive right to use the WHATABURGER® mark. For the reasons set forth below, we affirm the district court's order to the extent it concludes that Texas WAB is the "rightful owner" of the mark in Virginia, but we reverse the entry of judgment against Texas WAB and in favor of Virginia W-A-B.
 
 I.
 
 2
 On September 24, 1957, Harmon Dobson, founder of the Whataburger restaurant chain in Texas, was issued a certificate of registration, U.S. Reg. No. 652,137, for the word mark WHATABURGER in connection with hamburgers. Through a series of assignments, ownership of the registered mark was acquired by WhataPartnership, LP. In 1999, WhataPartnership and Texas WAB entered into a licensing agreement that granted Texas WAB the exclusive right to use and control the WHATABURGER® mark. Texas WAB maintains franchises in Texas, Arkansas, Arizona, Florida, Louisiana, Mississippi, New Mexico, Oklahoma and Mexico. Neither Texas WAB nor any of its predecessors in interest have ever opened or operated a Whataburger restaurant in Virginia.
 
 
 3
 Virginia W-A-B claims that Jack Branch, its founder and owner, opened a restaurant using the name "What-A-Burger" in Newport News, Virginia, prior to August 1, 1957, and therefore prior to the issuance of the certificate of registration now held by Texas WAB.[1] Branch moved to Richmond in 1958, where he opened another What-A-Burger restaurant, at which point his brother Paul became the proprietor of the Newport News location. From 1958 until 1989, Branch opened several additional What-A-Burger restaurants in various Virginia locations, including Richmond, Petersburg, Chester, and Colonial Heights. Virginia W-A-B was not incorporated until 1997; prior to that time, it was operated essentially as a sole proprietorship. The Newport News What-A-Burger proprietorship was incorporated in 1999 as a business entity separate from Virginia W-A-B.[2]
 
 
 4
 Virginia W-A-B and Texas WAB first became aware of each other in 1970. A representative of Texas WAB was traveling in Virginia and, noticing the What-A-Burger sign, stopped in one of the restaurants and mentioned the possibility of the Branches running the restaurant as a franchise of Texas WAB. The record contains a June 24, 1970, letter to Paul Branch from George Garrison, an officer of Texas WAB, referring to the meeting and indicating that Texas WAB held the name WHATABURGER® as a registered trademark. Garrison suggested that Texas WAB might be willing to license Virginia W-A-B to use its trademark, but noted that not all of the locations operated by the Branch brothers in Virginia met the standards maintained by Texas WAB. The letter made clear that Texas WAB expected Virginia W-A-B to change its name unless the parties reached a licensing agreement. The record contains a second letter, dated July 7, 1970, from Sam Main, General Manager for Texas WAB, suggesting that he meet with Paul Branch the following week in Richmond to discuss the issues raised in the Garrison letter.
 
 
 5
 The record does not reflect any further contact between these businesses until 2002, more than thirty years later. By that time, Texas WAB had expanded significantly, having opened more than 500 Whataburger restaurants across the southern United States and Mexico. In a letter dated January 25, 2002, an attorney representing Texas WAB indicated that Virginia W-A-B's use of the name What-A-Burger might be an infringement of Texas WAB's registered trademark; however, the letter allowed for the possibility that one of the Branch brothers had been granted the right to use the mark at some point in the past:
 
 
 6
 It has come to our client's attention that you operate restaurants in Newport News and Colonial Heights under the name WHAT-A-BURGER. Under ordinary circumstances, your use of this name would constitute a direct infringement of Whataburger, Inc.'s superior trademark rights in and to the WHATABURGER name. Our client believes, however, that you may be using the name pursuant to an agreement made by and between you (or your predecessor in interest) and our client's founder, Harmon Dobson, or perhaps another entity. If our client's belief is correct, your continued use of the WHAT-A-BURGER name within your immediate marketing area perhaps would not be deemed an actionable infringement of our client's rights.
 
 
 7
 J.A. 194. The letter closed with a request for "copies of any documents that purport to grant rights in the name to you (or to your predecessor in interest) by Mr. Dobson or anyone else associated with [Texas WAB]." J.A. 195.
 
 
 8
 In an effort to settle the issue of whether it could continue using the What-A-Burger name, Virginia W-A-B filed this declaratory judgment action, see 28 U.S.C.A. § 2201(a) (West 1994), seeking an order declaring that Virginia W-A-B is "the rightful owner[] of the trademark or trade name What-A-Burger in the State of Virginia" and therefore enjoys the right to "the exclusive use of [the] trademark... in the market areas of Richmond, Virginia; Chester, Virginia; Petersburg, Virginia; Newport News, Virginia; and Colonial Heights, Virginia." J.A. 9. Virginia W-A-B also sought a corollary pronouncement from the district court that it was "not guilty of federal trademark infringement." J.A. 10. The factual allegations supporting these claims were as follows: that Virginia W-A-B used the mark prior to the date of Texas WAB's registration; that Virginia W-A-B was "unaware of any superior right to the [mark]" and therefore used the mark in good faith; and that, in any event, Texas WAB "waived any right or claim [it has] or may have had to the use of the name What-A-Burger within the confines of the State of Virginia" because of Virginia W-A-B's "long usage of the name What-A-Burger." J.A. 9.
 
 
 9
 Texas WAB asserted a counterclaim, seeking a declaration that it, "by virtue of its exclusive licensing agreement with WhataPartnership, is the rightful owner of the trademark or trade name WHATABURGER... in the Commonwealth of Virginia ... and is entitled to ... the exclusive use of the trademark ... within the Commonwealth of Virginia." J.A. 18. Texas WAB, which has never done business in Virginia, did not allege in its counterclaim that Virginia W-A-B had infringed on its trademark. Consequently, it sought neither to enjoin Virginia W-A-B from using the name What-A-Burger nor to recover damages for such use. Because both parties sought a declaration regarding exclusive ownership of the trademark in Virginia, Texas WAB moved for summary judgment on both the complaint and counterclaim. Virginia W-A-B made no cross-motion for summary judgment.
 
 
 10
 The district court assumed for analytical purposes that, under the Lanham Act, Texas WAB's registered mark had acquired incontestable status, see 15 U.S.C.A. § 1065 (West 1997 & Supp.2003), which serves as "conclusive evidence of the validity of the registered mark ..., of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C.A. § 1115(b) (West Supp.2003).[3] Virginia W-A-B does not dispute that the mark has attained incontestable status; however, that does not settle the issue of which party has priority in Virginia. Although the name suggests otherwise, an incontestable registration is subject to a laundry list of statutory affirmative defenses. See 15 U.S.C.A. § 1115(b) (West 1998 & Supp.2003). The district court considered two of these defenses.
 
 
 11
 First, the district court considered whether Virginia W-A-B could take advantage of what has been deemed a "limited area" exception to the exclusive usage rights flowing from an incontestable mark. See 15 U.S.C.A. § 1115(b)(5) (West 1998); see generally 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 26:43-26:44 (4th ed.2003) [hereinafter McCarthy] (discussing the "Limited Area Defense" under § 1115(b)(5)). Under section 1115(b)(5), it is possible for an alleged infringer to establish the right to use within a limited geographical area the owner's registered trademark if the alleged infringer: (1) adopted the mark prior to the date of registration; (2) did so "without knowledge of the registrant's prior use"; and (3) used the mark continuously since that time. The non-registered user's superior right to use the mark under § 1115(b)(5) is limited, however, to "the area in which such continuous prior use is proved." 15 U.S.C.A. § 1115(b)(5). The district court rejected this limited statutory prior user defense as an option for Virginia W-A-B based on the court's finding that Virginia W-A-B offered insufficient evidence that it used the mark prior to the September 24, 1957 date of registration. See What-A-Burger of Va., Inc. v. Whataburger, Inc., of Corpus Christi, Texas, 256 F.Supp.2d 476, 481 (E.D.Va.2003). Thus, the district court entered a judgment order declaring that Texas WAB "is the rightful owner of the trademark WHATABURGER®." Id. at 483. Virginia W-A-B has not appealed this or any other portion of the order. As a result, the court's conclusion that Virginia W-A-B did not establish the limited-area prior-user defense under § 1115(b)(5) resolves the issue of which party has priority in the WHATABURGER® trademark in Virginia, confirming that Texas WAB enjoys the exclusive right to use its mark in Virginia.[4]
 
 
 12
 The remaining question considered by the district court was whether Texas WAB could enforce its ownership rights in Virginia against Virginia W-A-B. Under the Lanham Act, the owner of a registered mark may not be able to enjoin an infringing use of its mark where "equitable principles, including laches, estoppel, and acquiescence," prohibit him from doing so. 15 U.S.C.A. § 1115(b)(9) (West Supp.2003). The district court concluded sua sponte that Texas WAB was barred by laches from enforcing, in Virginia at least, its exclusive right to use and control the mark. See What-A-Burger, 256 F.Supp.2d at 482-83. The court based its conclusion on the fact that Texas WAB had been aware of Virginia W-A-B's operations and use of the name What-A-Burger since 1970 but unreasonably failed to follow up on its original contact for more than 30 years. Moreover, the district court reasoned that permitting Texas WAB to enforce its trademark rights after this lengthy delay would severely prejudice Virginia W-A-B, which continued to invest in its business and build goodwill and customer loyalty in Virginia under the name What-A-Burger.
 
 
 13
 Similarly, the district court concluded that the doctrine of acquiescence precluded Texas WAB from protecting its registered trademark in Virginia because a company "representative visited a [Virginia W-A-B] establishment, attempted to interest the owner in a franchise, offered advice for the improvement of [the] business, and failed to follow up on any requests that [Virginia W-A-B] change its name." Id. at 483. Even though the district court concluded that Texas WAB "is the rightful owner of the trademark WHATABURGER®," it denied Texas WAB's summary judgment motion because "the equitable defenses as set forth in 15 U.S.C. § 1115(b)(8) bar [Texas WAB] from asserting this right and obtaining ... an injunction against [Virginia W-A-B] barring use of the mark, in the state of Virginia." Id. Furthermore, the district court granted summary judgment sua sponte in favor of Virginia W-A-B.
 
 
 14
 Texas WAB appeals, arguing that the district court erroneously relied upon the doctrines of laches and acquiescence because it is undisputed that there has yet to be an infringing use of the mark by Virginia W-A-B, a prerequisite for the application of either laches or acquiescence. Texas WAB further contends that the court was obligated to award it summary judgment as a result of its finding that Texas WAB is the "rightful owner" of the mark, which Virginia W-A-B does not appeal. For the reasons that follow, we agree with Texas WAB.[5]
 
 II.
 A. Laches
 
 15
 The primary obstacle to the application of laches here is that there was never any infringing use of the mark by Virginia W-A-B to which Texas WAB was required to respond.[6] Estoppel by laches generally applies in a trademark infringement action to preclude relief for an owner of a mark who has unreasonably slept on his rights. See Brittingham v. Jenkins, 914 F.2d 447, 456 (4th Cir.1990). "[C]ourts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 461 (4th Cir.1996) (emphasis added). Thus, a court's consideration of laches in the trademark context should encompass at least these questions: "(1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay." Brittingham, 914 F.2d at 456. Because the Lanham Act does not include a limitations period, courts use the doctrine of laches to address the inequities created by a trademark owner who, despite having a colorable infringement claim, allows a competitor to develop its products around the mark and expand its business, only then to lower the litigation boom. See Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 824 (7th Cir.1999) (affirming district court's application of laches where plaintiff "permitted [defendant's] advertising and the development of its products to go unchecked" and "sat idly by and chose not to challenge [defendant's] use of [the mark] with respect to its products"); 5 McCarthy at § 31:12 ("Laches is a good defense if plaintiff's long failure to exercise its legal rights has caused defendant to rely to its detriment by building up a valuable business around its trademark.").
 
 
 16
 The district court determined that the first requirement for applying laches was met by the fact that Texas WAB knew about Virginia W-A-B no later than 1970, and therefore "learned of the infringement thirty-two years ago." What-A-Burger, 256 F.Supp.2d at 482. Texas WAB points out that it did not assert a counterclaim for infringement because it did not have, and never has had, an actionable infringement claim against Virginia W-A-B. Texas WAB questions how it could have unreasonably delayed "in asserting a right or claim" that it has never had the ability to assert. Kason Indus., Inc. v. Component Hardware Group, Inc., 120 F.3d 1199, 1203 (11th Cir.1997) (fundamental to laches is inexcusable "delay in asserting a right or claim"). Indeed, the key question, for purposes of estoppel by laches, is not simply whether there has been some delay, but whether that delay was unreasonable. See Sara Lee, 81 F.3d at 461; Brittingham, 914 F.2d at 456. Logic dictates that "unreasonable delay" does not include any period of time before the owner is able to pursue a claim for infringement — otherwise, a trademark owner could be punished for not bringing a claim he had no right to bring. For this reason, we have recognized that laches "assumes the existence of an infringement for an extended period prior to the commencement of litigation." See Sara Lee, 81 F.3d at 462.
 
 
 17
 Thus, regardless of when the trademark owner initially discovers the use of a similar mark, action against the infringing user is not necessary until, in light of the circumstances, the "right to protection ha[s] clearly ripened." Id.; see 5 McCarthy at § 31:19 ("[O]ne cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable." (internal quotation marks omitted) (alteration in original)). Instead of focusing on when the trademark owner first knew that another party was using its mark, the court should be trying to determine the time at which the use became infringing and the time at which the owner should have known it: "[T]o the extent that a plaintiff's prior knowledge may give rise to the defense of estoppel by laches, such knowledge must be of a pre-existing, infringing use of a mark." Sara Lee, 81 F.3d at 462; see Brittingham, 914 F.2d at 456 (explaining that, in determining whether laches applies, a court should ordinarily consider "whether the owner of the mark knew of the infringing use" (emphasis added)). Accordingly, "unreasonable delay" begins at "the time at which the [trademark owner] knows or should know she has a provable claim for infringement." Kason Indus., 120 F.3d at 1206; see Kellogg Co. v. Exxon Corp., 209 F.3d 562, 569 (6th Cir.2000) ("Implicit in a finding of laches ... is the presumption that an underlying claim for infringement existed at the time at which we begin to measure the plaintiff's delay."). The owner's mere knowledge that he might have an infringement claim at some future date is not sufficient to trigger the period of unreasonable delay required for estoppel by laches. See Profitness Phys. Therapy Ctr. v. Pro-Fit Orthopedic & Sports Phys. Therapy, 314 F.3d 62, 70 (2d Cir.2002) ("[A] plaintiff should not be obligated to sue until its right to protection has ripened such that plaintiff knew or should have known, not simply that defendant was using the potentially offending mark, but that plaintiff had a provable infringement claim against defendant.").
 
 
 18
 The district court, therefore, mistakenly measured the period of delay from Texas WAB's first knowledge of Virginia W-A-B's use of the mark without considering whether such use of the mark was an infringing use that required action by Texas WAB. Mere use of a mark that is similar or even identical to a registered trademark does not a fortiori establish infringement. The "keystone of infringement" is "the likelihood of confusion." Sara Lee, 81 F.3d at 462 (internal quotation marks omitted); see 15 U.S.C.A. § 1114(1)(a) and (b) (West 1997 & Supp. 2003) (infringement of a registered mark requires use that "is likely to cause confusion, or to cause mistake, or to deceive"). Although the district court observed that "the use of the names What-A-Burger and Whataburger is confusing," 256 F.Supp.2d at 484, similarity of the conflicting names is but one of many factors relevant to a determination of whether the concurrent use of the marks creates a likelihood of confusion. An informed analysis of whether the likelihood of confusion exists cannot rest solely upon a "side-by-side" comparison of the marks without regard to the marketplace in which they are used. Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997) ("[W]hen the public does not encounter the two marks together, it is inappropriate to focus on minor stylistic differences to determine if confusion is likely."). Usually, a court should consider a number of factors relating to the way in which the competing marks operate in the workplace. See Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir.1984) (providing a non-exclusive list of seven factors). For example, courts have considered "the similarity in scope of the parties' geographic markets" in deciding whether a likelihood of confusion exists. Kellogg, 209 F.3d at 572; see Profitness Therapy, 314 F.3d at 69-70 (comparing the territorial markets in which the parties operated); Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 296 (7th Cir.1998) (considering "the area and manner of concurrent use" of the trademarks). Another consideration when "the goods or services are sold in different territories" is "the extent to which the senior user's designation is known in the junior user's territory." 3 McCarthy at § 23:19. The fact that Texas WAB and Virginia W-A-B operate in separate territorial markets — and that Texas WAB professes no plans to enter the Virginia market — raises significant doubt that Virginia W-A-B's use of the mark creates the "likelihood of confusion" required for infringement.[7]
 
 
 19
 In Sara Lee, we explained that a trademark owner "has no obligation to sue," i.e., his right to protection has not ripened, "until the likelihood of confusion looms large." Sara Lee, 81 F.3d at 462 (internal quotation marks omitted). Unlike this appeal, Sara Lee presented a "progressive encroachment" fact pattern, wherein the defendant — the infringing user — "either gradually edges closer and closer in trademark similarity or product line operations or else escalates its volume or scale of operations so as to create a higher profile." 5 McCarthy at § 31:18. The question in such a case is this: at what point does the defendant's expansion create a sufficient likelihood of confusion to trigger the registered owner's obligation to sue? In the progressive encroachment context, a requirement obligating the owner to sue at the first sign of a potentially infringing use "would foster meritless litigation." Profitness Therapy, 314 F.3d at 70. The owner would likely be "rushe[d] immediately into litigation ... [with] little or no evidence of actual confusion and real commercial damage." Sara Lee, 81 F.3d at 462 (internal quotation marks omitted).
 
 
 20
 In this case, of course, if anyone is expanding the scope of its operations, it is the registered owner rather than the junior user. The principles underlying our decision in Sara Lee, however, are controlling here: (1) delay is measured from the time at which the owner knew of an infringing use sufficient to require legal action; and (2) legal action is not required until there is a real likelihood of confusion. Even if Texas WAB sought to enjoin Virginia W-A-B from operating its establishments in Virginia under the name What-A-Burger, it would not be able to do so on this record. Although "a senior federal registrant has superior priority" which extends nationwide, "there is no likely confusion for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory." 4 McCarthy at § 26:33. "[T]he injunctive remedy does not ripen until the registrant shows a likelihood of entry" into the territory in question. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 932 (4th Cir.1995) (second emphasis added); see Armand's Subway, Inc. v. Doctor's Assocs., Inc., 604 F.2d 849, 849-50 (4th Cir.1979) (explaining that even though the owner of a registered trade-mark has an exclusive right of use that enjoys nationwide protection, "the protection is only potential in areas where the registrant in fact does not do business" and that "[a] competing user could use the mark there until the registrant extended its business to the area"). In such a scenario, "a likelihood of confusion flows directly from the proof of likelihood of entry by the registrant." 4 McCarthy at § 26:34.
 
 
 21
 There is nothing in this case to indicate a likelihood of entry into the local Virginia market by Texas WAB (in fact, Texas WAB specifically disavows any such intention) or that the likelihood of confusion otherwise looms large, triggering the obligation for Texas WAB to initiate an action for trademark infringement. And, of course, the district court made no finding of an infringing use upon which to base its application of laches. Accordingly, we conclude that there was no unreasonable delay that would prevent Texas WAB from asserting its counterclaim for declaratory relief, and the application of laches was inappropriate.
 
 B. Acquiescence
 
 22
 As an additional basis for estopping Texas WAB from pursuing declaratory relief in its counterclaim, the district court held that Texas WAB acquiesced in the use of the What-A-Burger designation. Acquiescence is the active counterpart to laches, a doctrine based on passive consent. Both doctrines "connote consent by the owner to an infringing use of his mark," but "acquiescence implies active consent." Sara Lee, 81 F.3d at 462. Under this doctrine, which is encompassed within 15 U.S.C.A. § 1115(b)(9), "[a]n infringement action may be barred ... where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement." Sara Lee, 81 F.3d at 462. Our analysis here need not be extended. As with laches, acquiescence assumes a "preexisting infringement" that "requires that the trademark owner knowingly consent — albeit actively — to the defendant's infringing use of the mark." Id. at 463; see also Kellogg, 209 F.3d at 569 ("Implicit in a finding of... acquiescence is the presumption that an underlying claim for infringement existed...."). As explained above, we perceive nothing in the record to suggest an infringing use by Virginia W-A-B to which Texas WAB actively consented.
 
 III.
 
 23
 In accordance with the foregoing, we affirm the portion of the district court's order that recognizes Texas WAB as the rightful owner of the trademark WHATABURGER. We reverse the entry of summary judgment for Virginia W-A-B and remand for entry of judgment in favor of Texas WAB on its claim for declaratory judgment. Finally, we note that part of the relief sought by Virginia W-A-B was a declaration that it had not infringed on Texas WAB's registered trademark. In light of our opinion, and as Texas WAB acknowledges, there has been no infringement of its mark, the district court's order on remand should reflect that Virginia W-A-B has not infringed on the trademark at issue in this case.
 
 
 24
 
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED
 
 
 
 
 Notes:
 
 
 [1]
 The record indicates that, between 1951 and 1956, Branch helped operate several "What-A-Burger" restaurants owned by his cousin in South Carolina. Although his cousin's business was the genesis of the name What-A-Burger for Branch, Virginia W-A-B does not claim that its first use of the name relates back to these South Carolina restaurants
 
 
 [2]
 The plaintiffs-appellees in this case include both of these corporations — What-A-Burger of Virginia, Inc., and What-A-Burger of Newport News, Inc. — as well as Jack and Paul Branch. For ease of reference, we use the Virginia W-A-B designation to identify plaintiffs-appellees collectively
 
 
 [3]
 Incontestable status may be obtained by fulfilling the requirements of 15 U.S.C.A. § 1065, including that the registered mark has been in continuous use for five consecutive years and is still in use in commerceSee 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:142 (4th ed.2003).
 
 
 [4]
 This is essentially the only relief Texas WAB sought in its counter-claim — simple confirmation that it was the owner of the mark with the exclusive right of use in Virginia. Of course, we hasten to note that there is a distinction between the rights that flow from ownership, and the remedies — including an owner's right to enjoin another person's use of a mark — that ripen only when there is a likelihood of confusionSee Emergency One, Inc. v. American Fire Eagle Engine Co., 332 F.3d 264, 269 (4th Cir.2003); Lone Star Steakhouse & Saloon v. Alpha of Va., 43 F.3d 922, 932 (4th Cir.1995); Armand's Subway v. Doctor's Assocs., 604 F.2d 849 (4th Cir.1979). Thus, the mere fact that a registered mark has become incontestable does not relieve the registrant of proving infringement prior to obtaining a remedy. See 15 U.S.C.A. § 1115(b).
 
 
 [5]
 Texas WAB raises two additional challenges to the district court's order that are worth mentioning. First, Texas WAB argues that, as a matter of law, neither laches nor acquiescence apply in the absence of a claim of trademark infringement. Texas WAB claims that it asserted its declaratory judgment counterclaim merely to preserve its right as a registered trademark owner to exclusive use of the mark in Virginia in the event it ever expands there. Texas WAB argues that although an owner who has slept on his rights may be estopped by laches fromenforcing those rights by injunction against a junior user, Texas WAB is not attempting here to enjoin Virginia W-A-B from using the name What-A-Burger. In other words, because Texas WAB does not seek an injunction based on a claim of infringement by Virginia W-A-B, laches does not apply. Because we conclude that laches and acquiescence are not appropriate under the facts of this case in any event, we do not need to resolve this issue. We note, however, that a party in the position of Virginia W-A-B — a junior user who reasonably fears litigation for infringement — may force the issue of infringement through a declaratory judgment action and obtain closure on its right to continue using the mark. See Crown Drug Co. v. Revlon, Inc., 703 F.2d 240, 243 (7th Cir.1983). It is not inconceivable that laches could become an issue even though the declaratory judgment defendant — the trademark owner — asserts no counterclaim for infringement. For example, a junior user may seek a declaration that even if it has infringed, it has the right to continue using a particular mark because the owner has unreasonably delayed in enforcing his rights. Because the declaratory judgment vehicle exists for those"who [are] uncertain of [their] rights and who desire[] an early adjudication thereof without having to wait until [their] adversary should decide to bring suit," 5 McCarthy at § 32:50, we cannot say with certainty that the doctrine of laches can never be employed in a declaratory judgment action where the trademark owner is not seeking relief for infringement. In light of our conclusion, we also decline to address Texas WAB's additional argument that the district court committed reversible error by entering judgment in favor of Virginia W-A-B sua sponte, which afforded Texas WAB no notice or opportunity to respond to the issue upon which the district court's decision ultimately turned.
 
 
 [6]
 It is important to note from the outset that the mere fact that the names are virtually identical does not alone establish that there has been an infringing use. We elaborate on this point below, but it is a point that bears repetition
 
 
 [7]
 We do not mean to suggest that the likelihood of confusion analysis begins and ends with geographical territories, particularly when "the reputation of the senior user's mark has been carried into a trade area prior to the junior user's adoption and use," 4 McCarthy at § 26:18, which is not uncommon in cyberspace. Nevertheless, the nature of the product is significant in determining whether the consuming public is likely to be confused, and geography has a significant impact on this analysis with respect to consumers who frequent establishments operated by Virginia W-A-B. There is no evidence — nor can we imagine any — that consumers are currently likely to be confused about whether the burgers served by Virginia W-A-B come from Texas or Virginia. By contrast, there might be great confusion generated by someone who erects a replica of a McDonald's restaurant in a geographically remote area and begins serving similar food