United States Court of Appeals,

Eleventh Circuit.

No. 96-9157.

KASON INDUSTRIES, INC., Plaintiff-Counter-defendant-Appellant,

v.

COMPONENT HARDWARE GROUP, INC., Peachtree Distributing, Inc., Defendants-Counter-claimants-Appellees.

Aug. 29, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-CV-1259-RLV), Robert L. Vining, Jr., Judge.

Before HATCHETT, Chief Judge, ANDERSON, Circuit Judge, and LAY[*], Senior Circuit Judge.

LAY, Senior Circuit Judge:

Kason Industries, Inc., a New York corporation with its principal place of business in Georgia, has manufactured and distributed commercial refrigeration and food services equipment hardware since 1928. Kason brought claims for both monetary and injunctive relief against Component Hardware Group, Inc. (CHG) and Peachtree Distributing, Inc. under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 *et seq.,* and state common-law claims of trademark infringement and unfair competition. The essence of Kason's complaint is that CHG produced and marketed hardware nearly identical to that which Kason produces and sells, thereby creating a likelihood of confusion in the marketplace.[1] The district court granted summary judgment to CHG on the Lanham Act claims under the equitable doctrine of laches and similarly granted summary judgment on the state claims under both laches

---

[*]Honorable Donald P. Lay, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]Peachtree Distributing, Inc. is a distributor of CHG's products, and Peachtree's liability rests solely upon CHG's liability.

and the state statute of limitations.[2]  We vacate the judgment of the district court and remand the case for further consideration.[3]

*Background*

The commercial refrigeration and food services equipment hardware industry includes two market segments:  original equipment manufacturers (OEMs) and replacement parts distributors. OEMs purchase and incorporate certain latches and hinges into the final products they manufacture, such as commercial refrigerators.  Replacement parts distributors sell the hardware to commercial equipment owners who need the original hardware replaced.  Kason and CHG compete in these markets.

*The 533D and 5330 Latches*

Kason has manufactured a latch designated "533D" since 1957.  Kason's 533D latch is a snap-action chrome-finished latch and handle used on commercial refrigerators.  It was Kason's most popular item for the first fifteen years of its manufacture, and Kason contends it has become a "standard within the industry."  The primary market for the 533D, and the relevant difference between those markets for purposes of likelihood of confusion analysis, is unclear from the district court's opinion and the record.  On one hand, Frank McAteer, Kason's vice president of sales, estimated that in 1995 sixty to seventy percent of 533D latches were sold in the replacement market. On the other hand, Kason urges in its pleadings and briefs that its primary market, upon which CHG slowly encroached, is the OEM market.

---

[2]The district court's disposal of Kason's non-Lanham Act claims is a bit unclear.  The court first held Kason's Lanham Act claims barred by the doctrine of laches.  It then stated, "Because the state claims are based on the same facts, the court holds that they are also barred by laches or the statute of limitations."  On remand, the court should again consider the state law claims, keeping the principles of this opinion in mind, and state with specificity its findings as to Kason's state law claims.

[3]Though some of CHG's counterclaims remain in the district court, the district court stayed further action on them and certified its summary judgment order for appeal pursuant to Fed.R.Civ.P. 54(b).

In 1985, CHG began manufacturing a latch that Kason claims is virtually identical to its 533D latch. CHG's latch is designated "R26-5330,"[4] and is sold primarily in the replacement market.

After Kason learned of CHG's 5330, Kason's patent counsel sent a letter to CHG claiming that the manufacture of 5330 and its numeric designation violated Kason's trade dress rights.[5] In the letter, dated June 21, 1986, Kason demanded that CHG cease manufacturing the 5330 product. On August 4, 1986, CHG responded and refused, stating that it did not believe manufacture of the latch violated Kason's rights. Kason did not answer CHG's response. Kason urges that at that time of the exchange, its knowledge of CHG's entry into even the replacement market was minimal. It maintains it was not until several years later that it discovered CHG had entered the OEM market.

*The 171 and 1700 Latches*

Since 1960, Kason has manufactured and sold its "171" latch, which is a magnetic latch used on commercial refrigerators and ovens. In 1989, CHG began manufacturing a similar latch, which it designated as R25-1700 (the 1700). Sometime in 1990, Kason became aware that CHG was manufacturing the 1700, and conducted an internal investigation to assess the similarity of the 1700 to its own 171. Kason concluded that the products were virtually identical. CHG attempted to market its product to Kason's customers, which for the 171 are mostly OEMs. According to McAteer, however, Kason was able to maintain its customers by lowering the price on the 171.

*The 215 and 1010 Hinges*

The third product at issue is an edgemount hinge used on commercial kitchen equipment. Kason has manufactured and sold its "215 hinge" since 1964. In 1990, CHG began manufacturing

---

[4]For obvious reasons, Kason contends that CHG's R26-5330 latch is "commonly referred to as a '5330.' " CHG maintains that customers "refer to [the R26-5330] using the "R26' designation." We need not resolve this squabble here. However, we refer to CHG's products with the designation that most closely matches the name of Kason's products, because it helps clarify the latches compared.

[5]The parties do not dispute for purposes of this litigation that there exists any meaningful statutory difference between trade dress infringement and trademark infringement. On this basis, the terms are used interchangeably.

a "1010 hinge." Sometime between 1990 and 1993, Kason learned of the 1010, again conducted internal tests, and concluded that it is almost identical to Kason's 215. It is unclear whether CHG marketed the 1010 to the OEM market, the replacement market, or both. Burl Finkelstein, Kason's vice president of engineering, noted that "[w]hen [the 1010] first came out ... we heard of it being offered and we felt we had the customers using it pretty well sewed up."

Until this lawsuit was filed, other than the 1986 letter, Kason did not take any action against CHG regarding the manufacture or sale of these products. Finkelstein stated at the time that he did not "know what we could do," because he was not aware of any legal protection available to Kason.

*Discussion*

*Laches*

The equitable defense of estoppel by laches may be applied to bar claims for trade dress or trademark infringement brought under the Lanham Act. *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1517 (11th Cir.1984). Though the doctrine is an equitable doctrine that should be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1545 (11th Cir.1986). The Lanham Act does not contain a statute of limitations. However, in trademark cases this circuit has followed the Sixth Circuit, which applies the period for analogous state law claims as the touchstone for laches. *Id.* at 1546 (citing *Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 365 (6th Cir.1985)). The district court here followed this rule, and found that Georgia's Fair Business Practices Act, O.C.G.A § 10-1-390 *et seq.* (FBPA), is the state statute most analogous to Kason's Lanham Act claims. It then applied the FBPA's two-year limitations period as the touchstone for Kason's claims. *See* O.C.G.A. § 10-1-401. Kason's only proffered excuse for the delay was that "it did not believe that it was being sufficiently harmed to warrant bringing the action earlier." The court refused to excuse Kason's delay. It found in abbreviated discussion that Kason's delay caused CHG to suffer prejudice. CHG maintains records

4

only for two years. Thus, the district court reasoned that CHG did not have ample opportunity to demonstrate prejudice, because CHG could not show that it had expended substantial funds for advertising, production, or construction of the allegedly infringing products. The court held that "such an impediment is itself prejudicial to the rights of CHG."

*Applicable Limitations Period*

Kason challenges the district court's application of the FBPA as the action under state law most analogous to § 43(a) of the Lanham Act. Kason urges that the more analogous statute is the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 *et seq.* (UDTPA), which does not contain a statute of limitations.

Section 43(a) of the Lanham Act generally proscribes "false designations of origin and false descriptions" of goods or services. 15 U.S.C. § 1125(a). This circuit has long held that claims available under § 43(a) include a cause of action for trade dress infringement. *See, e.g., AmBrit,* 812 F.2d at 1535; *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 830-32 (11th Cir.1982). The standard for proof of liability under § 43(a) is the " "likelihood of confusion' resulting from the defendant's adoption of a trade dress similar to the plaintiff's." *Original Appalachian Artworks,* 684 F.2d at 831-32, *quoted in AmBrit,* 812 F.2d at 1538. The UDTPA is similar: it provides a cause of action when a person, "in the course of his business, vocation, or occupation ... [c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services." O.C.G.A. § 10-1-372(a)(2). It should be apparent that § 43(a) of the Lanham Act and § 10-1-372(a)(2) of the UDTPA provide analogous causes of action governed by the same standard.[6]

---

[6]The similarity of the two statutes is further evidenced by Georgia plaintiffs, who often bring claims for trademark or trade dress protection under both the Lanham Act and the UDTPA. *E.g., Debs v. Meliopoulos,* No. 1:90-cv-939-WCO, (N.D.Ga. Dec.18, 1991), *aff'd,* 986 F.2d 507 (11th Cir.1993); *Jellibeans, Inc. v. Skating Clubs, Inc.,* 716 F.2d 833, 839 (11th Cir.1983); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 254-55 (5th Cir.1980); *Robarb, Inc. v. Pool Builders Supply, Inc.,* 696 F.Supp. 621, 623-24 (N.D.Ga.1988).

In contrast, the FBPA is essentially a consumer protection statute, covering only "consumer transactions" and "consumer acts or practices." O.C.G.A. § 10-1-393(a).[7] The Georgia Supreme Court has refused to "expand the coverage of the Act to the commercial market as a whole," reading a consumer marketplace requirement into the statute, so that a defendant who sells a product to retailers is not within the scope of the act. *State ex rel. Ryles v. Meredith Chevrolet, Inc.,* 145 Ga.App. 8, 244 S.E.2d 15, 18-19 , *aff'd,* 242 Ga. 294, 249 S.E.2d 87 (1978). Without commenting on whether Kason can succeed on the merits of its claim under the FBPA, it is clear to us that the FBPA is significantly different from the UDTPA and the Lanham Act, because of the former statute's focus on the consumer (as opposed to the commercial) marketplace. *See* Donna S. Shapiro, Note, *The Georgia Fair Business Practices Act:  Business As Usual,* 9 Ga. St. U.L.Rev. 453, 466 (1993) (noting that the FBPA "expanded the scope" of the UDTPA by providing relief from "unscrupulous business practices" directly to consumers).

Of equal significance, while the standard of the UDTPA and the Lanham Act is "likelihood of confusion," the standard for an arguably analogous claim under the FBPA is "actual confusion." O.C.G.A. § 10-1-393(b)(3). There is a fundamental difference in these two standards that requires a different inquiry as to the commencement of the statute of limitations. Actual confusion, while harder to prove, is easier to identify, justifying a shorter (two-year) statute of limitations. Likelihood of confusion, on the other hand, is a more amorphous, multidimensional test, a matter of prediction rather than description. These characteristics make it difficult to determine when the likelihood of confusion standard is met, and thus it is reasonable to give plaintiffs more time to sue on a claim held to that standard.

---

[7]The FBPA defines "consumer transactions" as "the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes," and "consumer acts or practices" as those which are "intended to encourage consumer transactions." O.C.G.A. § 10-1-392(a)(2), (3).

We therefore conclude that the district court erred in applying the two-year statute of limitations contained in the FBPA to Kason's Lanham Act claims. As Kason contends, the UDTPA is the proper analogous state statute to apply for statute of limitations purposes.[8]

Our conclusion does not, however, render Kason "home free." As previously indicated, the UDTPA does not contain a limitations period. Thus, we must look to Georgia law to determine the period the UDTPA should borrow.

Two Georgia statutes require discussion. First, a twenty-year statute of limitations is found in O.C.G.A. § 9-3-22. It has been applied in various contexts by Georgia courts to fill in a statute of limitations where the legislature did not provide one. *See, e.g., Stafford v. Muscogee County Bd. of Educ.,* 688 F.2d 1383 (11th Cir.1982) (employment discrimination claims for injunctive and declaratory relief under 42 U.S.C. § 1981); *Pierce v. Rhodes,* 208 Ga. 554, 67 S.E.2d 771 (1951) (claim for payment of monthly pension); *Perry & Co. v. Knight Ins. Underwriters, Inc.,* 149 Ga.App. 128, 253 S.E.2d 808 (1979) (claim for unearned insurance premiums under O.C.G.A. § 33-22-14(a)).

The second is a four-year statute of limitations governing "[i]njuries to personalty." O.C.G.A. § 9-3-31. It has been most often used in actions for common-law fraud, *see, e.g., Stricker v. Epstein,* 213 Ga.App. 226, 444 S.E.2d 91, 94 (1994); *Quinn v. Forsyth,* 116 Ga.App. 611, 158 S.E.2d 686, 693 (1967), and actions under Georgia's general fraud statute, O.C.G.A. §§ 51-6-1, 51-6-2. *See, e.g., McNeal v. Paine, Webber, Jackson & Curtis, Inc.,* 598 F.2d 888, 893-95 (5th Cir.1979) (applying Georgia's extant fraud statute, O.C.G.A. §§ 105-301, 105-302 (1933)).

---

[8]The district court, justifying its use of the FBPA's limitation period, noted that its decision is "buttressed by the fact that Count III of Kason's complaint alleges that the actions of the defendants violated Georgia's Fair Business Practices Act." The district court is correct—Kason brought claims under FBPA as well. That fact, however, is not enough to overcome the similarity of the UDTPA and the Lanham Act, and the differences between those statutes and the FBPA.

The UDTPA fits both of these paradigms. It is both a statute without a specified limitations period, falling under O.C.G.A. § 9-3-22, and a statute allowing recovery for injury to personalty, falling under O.C.G.A. § 9-3-31.

In *Currie v. Cayman Resources Corp.*, 595 F.Supp. 1364, 1378 (N.D.Ga.1984), the district court concluded without analysis that "[t]he limitations period applicable to the plaintiff's claim brought under the [UDTPA] is, as the parties assert, the four-year period applicable to injuries to personalty...." *Id.* This decision seems logical. An action under the UDTPA has many of the same characteristics as the actions for fraud to which the four-year limitation period of § 9-3-31 has been applied. The same, of course, can be said of the claims brought here. In addition, applying § 9-3-31 with its four-year statute of limitations to the UDTPA is a more narrowly tailored solution to our problem than applying § 9-3-22 with its twenty-year provision. The latter applies to *any* action created by a statute that does not contain its own limitations period, while the former applies to the narrower group of actions that also do not have a specific limitations period *and* that request relief from injury to personalty.

We thus deem the four-year limitations period set forth in § 9-3-31 the proper statute of limitations for the UDTPA to borrow.

*Measure of Delay (Progressive Encroachment)*

After applying the two-year limitations period of the FBPA, the district court found that Kason delayed "eleven, five, and two years in bringing its claims against CHG." Though the court's order fails to explain its calculation, it appears as if it measured Kason's delay from the time Kason was first aware of CHG's manufacture of the products at issue. Kason brought suit in 1995, but knew of the manufacture of CHG's 5330 in 1986,[9] knew of the 1700 latch in 1990, and knew of the 1010 hinge sometime between 1990 and 1993.

---

[9]We can only assume the eleven-year delay the court found as to the 5330 was a typographical or mathematical error. CHG did not manufacture the 5330 until 1985, so Kason's delay could not have been eleven years on this product.

Kason argues that the court erred in employing the date of Kason's awareness of the product as the trigger for delay. In order to establish a claim for trade dress infringement, a plaintiff must demonstrate both likelihood of confusion and inherent distinctiveness or secondary meaning. *AmBrit,* 812 F.2d at 1535.[10] Kason argues that these two elements are not easily proven immediately upon discovering the existence of a possibly infringing product. Therefore, it contends, the more reasonable time to begin to measure delay is when the plaintiff knows or should know she has a claim. Kason relies on *Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770 (Fed.Cir.1995). In *Gasser Chair,* the Federal Circuit held that the measure of delay for laches purposes in a trade dress claim begins when a plaintiff's "right ripens into one entitled to protection." 60 F.3d at 777 (citation omitted). In response, CHG points to this court's decision in *AmBrit,* which measured delay in a trade dress case from the time the plaintiff "became aware" of the defendant's manufacture of the allegedly infringing product. 812 F.2d at 1546.

Kason also argues that any delay the court finds may be excused under the doctrine of progressive encroachment. Under this doctrine, where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused. Kason contends that CHG slowly encroached on its market, for each product at issue, beginning with the replacement market and moving to OEMs, or vice versa.

The doctrine of progressive encroachment is relevant in assessing whether laches applies to bar a trademark claim. In *Conagra,* this court determined that laches did not apply to bar a plaintiff's claim for trademark infringement in the processed shrimp market where the plaintiff "did not become aware of the defendant's direct competition in the processed shrimp market until after [the] lawsuit began." 743 F.2d at 1517. The plaintiff had been aware of the defendant's use of the allegedly infringing mark in various other shrimp businesses for over ten years. *Id.* at 1518. Likewise, in *SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1345 (11th

---

[10]In addition, a plaintiff must prove that the trade dress is primarily non-functional. *Id.*

9

Cir.1996), this court determined that a delay is "excusable" where an alleged infringer at first "sold different products in a different market through different distribution channels" later coming in direct competition with the plaintiff. *See also Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 462 (4th Cir.1996) (holding a district court to be in error for applying estoppel by laches where a plaintiff "chose to delay its pursuit of a remedy until its right to protection had clearly ripened").

Though courts typically discuss encroachment as an excuse for delay, a close examination of the above-cited cases reveals that the doctrine significantly overlaps the courts' inquiry into when delay begins. In *AmBrit,* for example, this court measured delay from the point where the plaintiff knew the defendant was manufacturing the allegedly infringing product, but we considered the plaintiff's reasonable explanation for failing to sue immediately. 812 F.2d at 1546. Thus, as we recognized, the plaintiff did not really "delay" at all. *See id.* at 1545 n. 75 ("The court's finding that the delay was "reasonable' equates with a finding that there was no delay and that the first element of the laches defense had not been established."). This distinction may be largely semantic; nonetheless, our view of the cases is that delay is to be measured from the time at which the plaintiff knows or should know she has a provable claim for infringement. Thus, a court should consider, in its assessment of laches, progressive encroachment, damage the plaintiff was suffering, and the likelihood of confusion at the time the plaintiff sued. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 31.19 (4th ed. 1997) ("The senior user has no obligation to sue until "the likelihood of confusion looms large'...."); *Sara Lee Corp.,* 81 F.3d at 462 (quoting and agreeing with McCarthy). As Professor McCarthy noted, any other rule "would require each trademark owner to sue first and ask questions later." *McCarthy on Trademarks, supra,* at § 31.19.

*Prejudice*

The last element a defendant must prove is that the plaintiff's delay, whatever the measure, caused the defendant undue prejudice. *AmBrit,* 812 F.2d at 1545. Kason argues that the district court erred in its examination of prejudice. The court found that the death of two witnesses and CHG's policy of destroying documents after two years caused enough prejudice to warrant estoppel

10

of Kason's claims. Kason argues that one of these witnesses died in the late 1970s, before CHG came into existence. The witness would have had information on the initial development at Kason of the products at issue. Kason points out that this witness's usefulness, had he lived, would have been limited because the primary issue on the merits of Kason's claim will have little or nothing to do with Kason's processes of product creation. We agree. Kason also objects to the district court's reliance on CHG's two-year document destruction policy in its assessment of prejudice. It notes that CHG was on notice of possible suit after the 1986 letter, and destroyed its documents anyway. Kason's objection, of course, is that CHG should not be able to destroy documents and escape suit. Again, we agree. However, the prejudice issue should be analyzed in the context of delay, which the district court needs to reconsider. Therefore, we leave it to the district court to reconsider prejudice in light of its new determination of delay.

*Application*

We think it is clear in light of our discussion that Kason's claims over CHG's 1700 latch and 1010 hinge should be reevaluated. Although Kason's claim as to infringement on its 533D latch is less persuasive, we feel the district court must reevaluate this claim as well. If we were to measure delay on the 5330 claim from the point of the 1986 letter to the point of suit, we could determine that Kason delayed nine years as a matter of law. However, on the record presented and the district court's findings, we cannot determine whether the 1986 letter is the correct point from which to measure delay. The district court should have evaluated under the progressive encroachment theory the point at which Kason could have demonstrated likelihood of confusion in its primary (either OEM or replacement) market. Without findings on this issue, we cannot tell on the 5330 claim whether Kason claimed infringement in only the OEM market or the replacement market, or both. It is not clear when Kason determined there was a likelihood of confusion in either market to file a claim for dress infringement. Thus, the district court on remand must view the merits of Kason's claims of trade dress infringement for each product in terms of the market involved. It must determine whether there is a difference between the two markets material to the infringement claim,

11

and whether and when any likelihood of confusion might have ripened into a claim. We deem all of these facts not only relevant to the merits of Kason's claims, but also relevant to the equitable doctrine of laches and when, if at all, Kason legally could have asserted a provable claim of trade dress infringement. On the record submitted, without further explication by the district court, we cannot say as a matter of law that laches bars any claim.

It could be, of course, that summary judgment in favor of CHG is still appropriate. Our decision today expresses no opinion on whether Kason presented a genuine issue of material fact on these issues. Without more than conclusory findings by the district court, we are left uncertain as to the scope of our review.

*Injunctive Relief*

Kason urged the district court to impose injunctive relief even if estoppel by laches bars Kason's claim for monetary damages. The court denied injunctive relief, holding that estoppel by laches also bars such relief unless the defendant has engaged in conscious infringement or fraudulent imitation. Slip op. at 7 (citing *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918)). According to the district court, since there is a "genuine doubt as to whether CHG's products violated Kason's trade dress," laches can be appropriately invoked to bar Kason's claims for injunctive relief.

We disagree with this conclusion. Generally, laches will not bar an injunction against an intentional infringer. But it is not correct to state that cases of intentional infringement are the *only* cases where injunctive relief might be appropriate despite a plaintiff's delay. Instead, the equitable nature of estoppel by laches must be foremost in the court's mind. Thus, if the likelihood of confusion is inevitable, or so strong as to outweigh the effect of the plaintiff's delay in bringing a suit, a court may in its discretion grant injunctive relief, even in cases where a suit for damages is appropriately barred. *See* Restatement (Third) of Unfair Competition § 31, cmt. e (1995) ("[B]ecause of the public interest in preventing the deception of consumers, delay by the trademark owner will not ordinarily disable it from obtaining an injunction if there is strong evidence of likely

12

or actual confusion."); *see also SunAmerica,* 77 F.3d at 1334 (recognizing that "inevitable confusion" revives a plaintiff's claim for injunctive relief from estoppel); *University of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1044 (3d Cir.1982) (describing the "common situation" where a plaintiff's delay "will bar its claim for an accounting for past infringement but not for prospective injunctive relief"). The district court must weigh the equities of the case and the strength of Kason's case when determining whether injunctive relief is appropriate. This issue will "require a careful, fact-intensive consideration," and thus we "leave it for the district court and its informed discretion on remand." *SunAmerica,* 77 F.3d at 1346.

The judgment of the district court is VACATED and the cause REMANDED for further proceedings in accord with this opinion.