**JOHNNY'S FINE FOODS, INC.**

v.

**JOHNNY'S INC.**

No. 1:01–0107.

United States District Court, M.D. Tennessee, Columbia Division.

Oct. 2, 2003.

Charles F. Morrow, Charles C. Harrell, Kimberly E. Sands, Butler, Snow, O'Mara, Stevens & Cannada, PLLC, Memphis, TN, for Johnny's Fine Foods, Inc., pltf.

William M. Harris, Lawrenceburg, TN, for Johnny's Inc., deft.

## MEMORANDUM

HIGGINS, District Judge.

This matter was tried before the Court without a jury on August 28 and 29, 2002, on the plaintiff's claims for federal trademark violations under authority of 15 U.S.C. §§ 1114, 1125(a) and 1125(c), analogous state law claims under the Tennessee Consumer Protection Act, Tenn.Code Ann. § 47–18–104, and state common law prohibitions on trademark infringement and unfair competition. The plaintiff sought a recovery of the defendant's proceeds from the use of the plaintiff's trademark, in addition to punitive damages and equitable relief. The Court's jurisdiction is undisputed.

The plaintiff's federal cause of action, based upon alleged trademark infringements, is brought under the Lanham Act, which provides in pertinent part as follows:

(1) Any person who shall, without the consent of the registrant -

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). The Act goes on to provide that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The Court is empowered to issue injunctions to prevent violations of either subsection. 15 U.S.C. § 1116(a). Further, the Act addresses the dilution of famous marks as follows:

(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to

obtain such other relief as is provided in this subsection . . . . .

15 U.S.C. § 1125(c).

For the reasons set forth below, the Court finds in favor of the plaintiff only with respect to the issuance of an injunction against any and all future use by the defendant of the marks "Johnny's" and "Johnny's Gourmet." In all other aspects the Court finds in favor of the defendant.

## I. FINDINGS OF FACT

The plaintiff corporation sells barbecue and other seasonings and salts, marinades and mustards under the federally registered trademark names "JOHNNY'S" and "JOHNNY'S LITE," which it owns and has used since at least 1959 and 1984, respectively.[1] The defendant corporation is wholly owned by Mr. Johnny Fleeman, and sells steak sauce and marinades, barbecue sauce, cocktail sauce and salad dressings. In or about October 1992, the defendant began selling steak seasoning and marinade labeled as "JOHNNY'S" out of Mr. Fleeman's restaurant in Lawrenceburg, Tennessee, The Brass Lantern. In 1993 the defendant began distributing "Johnny's Steak Seasoning and Marinade" in grocery stores in Tennessee and Alabama, and in or around 1996 expanded into Georgia, South Carolina and Arkansas.

In July 1997, Mr. John Meaker, then the president of the plaintiff's predecessor corporation, contacted Mr. Fleeman to notify him of attempts to redeem the defendant's coupons with the plaintiff corporation. Mr. Meaker pointed out that the plaintiff owned the "JOHNNY'S" trademark and that there was "confusion as to the name, JOHNNY'S." (Plaintiff's Exhibit 21). In a second letter dated August

---

1. Prior to 1998, the marks were owned and used by Johnny's Enterprises, Inc., which has since merged into Johnny's Fine Foods, Inc.

14, 1997, Mr. Meaker noted that the confusion was centered on the coupons, and stated that his objective was to have the defendant emphasize its address, change the letter type or make other changes to the coupons themselves to avoid the confusion. (Defendant's Exhibit 6). Although the plaintiff asserts that Mr. Meaker and Mr. Fleeman reached a verbal agreement on August 20, 1997, for Mr. Fleeman to change the label on his product, the defendant disputes this assertion. For reasons explained in the course of the analysis to follow, the Court credits Mr. Fleeman's testimony on this issue, and concludes as a matter of fact that Mr. Fleeman never indicated or promised Mr. Meaker that he would remove his name from his labels. Rather, Defendant's counsel responded with a letter dated September 3, 1997, to the effect that the defendant would be pleased to work with Mr. Meaker to avoid the possibility of confusion by way of the company address and lettering on the coupons, and would notify him when he decided on a particular course of action. (Plaintiff's Exhibit 253, Deposition of June Wahlstrom, Attachment 6). The course of action ultimately adopted by the defendant was simply to stop issuing coupons in 1997.[2]

The plaintiff and defendant had no further contact until March 2001,[3] when counsel for the plaintiff wrote Mr. Fleeman and informed him that the defendant's use of the "JOHNNY'S" mark on identical product lines constituted a violation of the Lanham Act, of the common law with respect to trademark infringement and unfair competition, and of state law. The letter demanded, among other things, that the defendant cease and desist from using the JOHNNY'S mark, retrieve and destroy all promotional documentation in its possession or under its control bearing the mark, and provide an accounting of all profits and advantages it had derived from use of the mark. (Plaintiff's Exhibit 4).

As a result of this letter, and following an exchange of telephone calls and letters between counsel for the parties, in July 2001 the defendant began to label and distribute its new product under the names "Johnny Fleeman's" and "Johnny Fleeman's GOURMET," although the speed with which it did so, and the time during which and extent to which the old product remained or remains on store shelves is a source of dissatisfaction to the plaintiff. The defendant acknowledges that it continued to ship its existing stock of product bearing the "JOHNNY'S" mark throughout 2001, and that its website contained images of products bearing the "JOHNNY'S" name until February 2002.

## II. ANALYSIS

### A. Acquiescence and Laches

The defendant has raised the affirmative defenses of acquiescence and laches to the plaintiff's claims. The United States Court of Appeals for the Sixth Circuit has explained the distinction between these two defenses as follows:

> Laches is a negligent and unintentional failure to protect one's rights while acquiescence is intentional. Acquiescence requires "a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert

---

**2.** Mr. Fleeman testified that his company did not issue coupons again until mid to late 2000, when he issued coupons in the form of a booklet adhered directly to his product.

**3.** There is nothing in the record to support Ms. Wahlstrom's vague "feeling" that Mr. Meaker and Mr. Fleeman spoke again in December 1997, and nothing is known about the substance of any such conversation. (Wahlstrom depos. P. 22 1. 25—p. 23 1. 15).

his trademark rights against the defendant."

*Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (quoting *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984)).[4]

■ Both laches and acquiescence require a showing of an unreasonable delay by the plaintiff in bringing suit, and a resulting material prejudice to the defendant. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir.2000); *Board of Regents of the University System of Georgia v. Buzas Baseball, Inc.*, 176 F.Supp.2d 1338, 1347 (N.D.Ga.2001) (citing *Coach House Restaurant v. Coach and Six Restaurants*, 934 F.2d 1551, 1558 (11th Cir. 1991)).

■ With respect to what amounts to an unreasonable delay, this Circuit holds faithfully to the principle that "a suit will not be barred [by laches] before the analogous statute [of limitations] has run but will be barred after the statutory time has run," describing it as a presumption that "should remain strong and uneroded in trademark cases." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365, 366 (6th Cir.1985). The analogous Tennessee limitations period for trademark violations under 15 U.S.C. §§ 1114 and 1125(c) is the three year period provided for actions for tortious injury to property. Tenn.Code Ann. § 28–3–105; *Tandy Corp.* at 366; *Federal Express Corp. v. U.S.P.S.*, 75 F.Supp.2d 807, 815–16 (W.D.Tenn.1999). Actions for unfair competition under 15 U.S.C. § 1125(a) are governed by the one year statute of limitations provided by the Tennessee Consumer Protection Act. Tenn.Code Ann. § 47–18–110; *Federal Express* at 816.

■ In this case the Court finds that the plaintiff did not express its intention to assert its exclusive right to the "Johnny's" mark until March 6, 2001, more than four and a half years after learning of the defendant's use of the mark and indicating that such right would not be asserted, and well beyond either of the applicable limitations periods. Contrary to the plaintiff's contention that it "again discovered" in early 2001 that the defendant had continued to use the term "Johnny's" on its product, it should have been on notice of the continual use of "Johnny's" by the defendant in one form or another since their first contact in 1997. Far from indicating that it would change its name, the defendant had responded at that time to the effect that it had the right to continue to use the name "Johnny's." (Defendant's Exhibit 5). The plaintiff may not rely on an unreasonable and unfounded notion that infringing activity had ceased after initial contact in order to defeat a claim of laches or acquiescence. *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 409 (6th Cir.2002). Accordingly, the plaintiff's case is presumed to be barred, and the Court finds no exceptional circumstances to overcome that presumption.

Moreover, during those intervening years the defendant invested significant effort and funds in expanding its business using various incarnations of the term "Johnny's," all in reasonable reliance on the tacit assurance by the plaintiff's predecessor company that such use was permissible. This reliance greatly increased the defendant's potential liability in a long-delayed trademark action and clearly amounts to prejudice to the defendant. The Court therefore concludes that the

---

**4.** Because the law of laches and acquiescence in Tennessee is "virtually identical to the law of this Circuit," (*Elvis Presley Enterprises* at 895, n. 3), the Court's analysis herein under the guiding federal principles is also dispositive of the state law claims.

defendant has successfully established its defense of laches to the plaintiff's claims.

■ The Court's finding of laches does not end the inquiry, however, because laches alone would only bar damages for past violations, whereas affirmative acquiescence by the plaintiff would also typically bar injunctive relief. *Kellogg Co.*, 209 F.3d at 568–69 (explaining that because laches precludes damages but not injunctive relief, defendant could only defeat plaintiff's claim for injunctive relief by establishing acquiescence); *Tandy Corp.* at 366 n. 2 (finding that lower court erred in barring both damages and injunctive relief upon finding of laches, because denial of injunctive relief required finding "some affirmative conduct in the nature of an estoppel").[5] The Court must therefore go on to consider whether the defendant has established the remaining element of acquiescence by showing that it was actually misled by a representation by the plaintiff that the defendant's continued use of the "Johnny's" mark was permissible. *See Kellogg Co.* at 573–74.

■ In forwarding this theory, the defendant relies primarily on the 1997 communications between Mr. Fleeman and Mr. Meaker. As noted above, Mr. Meaker first wrote to Johnny's Inc. on July 10, 1997, complaining of customer confusion regarding the name "Johnny's" as evidenced by the defendant's coupons having been sent to Johnny's Fine Foods for redemption. Mr. Meaker's letter also notes that the trademark "Johnny's" had been registered to his company since 1973. However, upon receiving the overly self-assured response from counsel representing the defendant, Mr. Meaker followed up with a letter dated August 14, 1997, in which he expressly indicated that his sole interest was in resolving the confusion with respect to redemption of the defendant's coupons. The text of that letter is significant and reads as follows:

Dear Mr. Smith:

The current confusion centers on the "Redeemable Coupons." I trust this and any possible future customer confusion can be avoided.

5. The Court acknowledges that the United States Court of Appeals for the Eleventh Circuit has indicated in several cases that acquiescence is the equivalent of an implied license, capable of being revoked at any time by the licensor. *See, e.g., Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1563 (11th Cir.1991); *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir.1984). The keystone of that line of holdings within the Eleventh Circuit is the *Conagra* decision, which employs the term acquiescence differently than the way it is used today in this circuit. In that case the court based its finding of acquiescence on the fact that the plaintiff's predecessor "was aware of and did not object to [the defendant's] businesses using the Singleton name." *Id.* at 1516. This passive failure to protect one's rights would not constitute the affirmative assurance to the defendant necessary to establish acquiescence in this circuit. Rather, such a delay in objecting to infringement would support only a claim of laches, which,

as noted above, could be essentially revoked by bringing suit and provide a plaintiff with the opportunity for injunctive relief. Further support for this distinction is found in *Menendez v. Holt*, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888), the Supreme Court case upon which *Conagra* relies. This case is often cited for the proposition that laches alone will not bar injunctive relief, and although it uses the term acquiescence once, it does so in a context that makes clear that the term is being used interchangeably with laches, simply to mean passive tolerance rather than affirmative consent. *Id.* at 523–24, 9 S.Ct. 143. Specifically, the Court's references are to "delay in seeking relief," "mere delay or acquiescence," "mere procrastination in seeking redress," and "knowledge and silence merely." *Id.* The difference between laches and acquiescence has been refined since 1888, and it is now clear in this circuit that the legal effects of acquiescence endure even beyond the point at which a plaintiff decides to object or bring suit.

Could your company's address be emphasized in bigger print on these coupons? Also in the near future could they [sic] type of lettering be changed, such as all capital letters, or could some other or additive changes be made to hopefully avoid customer confusion?

This is my objective and the purpose of my writing of these letters.

Thank you for your consideration.

(Defendant's Exhibit 6). Despite the broader implications of Mr. Meaker's first letter to the defendant, the focus of his August 14 letter is perfectly clear. The Court concludes that it would be difficult to construe this letter as anything other than an assurance to the defendant that the plaintiff's predecessor was simply seeking changes to the defendant's coupons to ensure that they were more distinctly recognizable by customers and were routed properly, rather than asserting any trademark rights with respect to use of the name "Johnny's" on the defendant's goods.

Although the record includes evidence that Mr. Meaker's secretary, Ms. June Wahlstrom, recorded a note on August 20, 1997, that would indicate that Mr. Fleeman had verbally informed Mr. Meaker that he was going to change his label,[6] the Court finds that this vague, third-hand information is insufficient to overcome the obvious import of Mr. Meaker's own August 14 letter. Ms. Wahlstrom testified that she did not actually hear the conversation between Mr. Meaker and Mr. Fleeman, and that her note was simply her "interpretation" of Mr. Meaker's brief description of the conversation. (Plaintiff's Exhibit 253, Wahlstrom Deposition, p. 26 ll. 4–14). Even assuming, despite Mr. Fleeman's denial, that any conversation took place between Mr. Meaker and Mr. Fleeman after

the August 14 letter, Ms. Wahlstrom could have misunderstood what she was told about the conversation, or could have mistakenly referred to "label" rather than "coupon." Moreover, the "change" to which her note refers could simply have been larger print or different lettering, as Mr. Meaker had asked the defendant to use on its coupons. In short, the Court refuses to infer that this note establishes that Mr. Fleeman voluntarily offered to change the substance of his mark despite Mr. Meaker's written request merely for changes to the defendant's coupons. The Court's conclusion is bolstered by the September 3, 1997, letter from the defendant's counsel to Mr. Meaker, which again makes clear that the issues being addressed by both sides relate solely to "the company's address on the redeemable coupons, and the type of lettering." (*Id.*, Attachment 6).

Accordingly, the Court sustains the defendant's acquiescence defense, and finds that both monetary and injunctive relief are barred in this action subject to the specific exceptions made below.

## B. Progressive Encroachment

The plaintiff asserts that even if the Court finds acquiescence, that defense is defeated by the defendant's progressive encroachment upon the plaintiff's rights. In 1997, when the plaintiff's predecessor acquiesced to the defendant's use of the "Johnny's" mark on its products, the defendant's products bearing that name were being sold in grocery stores in Tennessee, Alabama, Georgia, South Carolina and Arkansas, in addition to being sold in Mr. Fleeman's restaurants. At that time the defendant's products consisted of a steak marinade, a barbecue sauce and a honey mustard dressing. Accordingly, at the

---

**6.** Specifically, that note reads: "Mr. Meaker talked with Mr. Fleeman. He is going to use up supply of labels and then change." (Plaintiff's Exhibit 253, Wahlstrom Deposition, Attachment 5).

time of the plaintiff's acquiescence, the defendant was already in direct competition with the plaintiff, using the same mark on nearly identical products in multiple states throughout the southeast. It is undisputed that since that time, the defendant has expanded both its product lines and its geographic distribution, and that the defendant's products are also being sold via the internet. Mr. Fleeman testified at trial that through telephone and internet orders the defendant has probably sold product in 40 states, but has also testified that its product has been primarily sold in the Mid–South and Central state regions. (Plaintiff's Exhibit 247, p. 11).

The progressive encroachment theory exists in order to prevent would-be plaintiffs from being forced to sue at the first sight of possible infringement, before the potential for actual confusion in the marketplace has become apparent or been realized. In other words, a plaintiff may rely on progressive encroachment in cases where an earlier suit might have been premature: "it applies in cases where the defendant has engaged in some infringing use of its trademark ... but the plaintiff does not bring suit right away because the nature of defendant's infringement is such that the plaintiff's claim has yet to ripen into one sufficiently colorable to justify litigation." *Kellogg Co.*, 209 F.3d at 570.

Not just any change in the manner in which a defendant uses a mark will suffice to constitute progressive encroachment, however. "Progressive encroachment requires something about the defendant's use of the mark to have changed significantly." *Nartron*, 305 F.3d at 410. Essentially, in order to ascertain whether progressive encroachment has taken place, the Court must address the likelihood of confusion between the parties' products and determine whether some change in the defendants' use of the mark has brought about a new or additional likelihood of confusion. *Kellogg Co.* at 571–73. "[T]he progressive encroachment analysis turns not on the single question of direct competition, but rather, on the likelihood of confusion resulting from the defendant's moving into the same or similar market area and placing itself more squarely in competition with the plaintiff." *Id.* at 573. Among the factors to be considered are "whether the defendant has brought itself more squarely into competition with the plaintiff, whether the defendant has made changes to its mark over the years so that it more closely resembles plaintiff's mark, whether the parties market to the same customers or area, and whether the parties sell products interchangeable in use." *Id.*

As noted above, at the time of the plaintiff's acquiescence, the defendant was using the plaintiff's entire mark on identical products in several of the same geographic areas, and the plaintiff's predecessor was already noting and complaining of confusion within commercial channels as evidenced by the misdirection of the defendant's coupons to the plaintiff. Moreover, it was taking place in a large enough geographic area by 1997 that the likelihood of confusion could already have been established at the time the plaintiff learned of the infringement; in fact, it was administrative confusion on the part of professionals that first brought the infringement to the plaintiff's attention. The defendant's expansion since that time into a larger geographic area has undoubtedly increased the *number* of consumers who might have been confused as to the origin of the parties' products, but this change is one of degree, not of kind, and is not determinative on the critical question of "whether and when any likelihood of confusion might have ripened into a claim." *See Kellogg* at 571 (quoting *Kason Indus., Inc. v. Component Hardware Group*, 120 F.3d 1199, 1206–07 (11th Cir.1997)). The defendant's expansion and increased marketing efforts

have increased the amount of competition between the parties' products, but the existence of a broad and growing direct competition among interchangeable products could not have been more clear than it was in 1997.

In fact, the increase in the scope of the defendant's business is one of the very factors typically required in order for it to show prejudice, one of the elements of its estoppel defense. *Ralston Purina Co. v. Midwest Cordage Co.*, 54 C.C.P.A. 1213, 373 F.2d 1015, 1019 (Cust. Pat.App.1967) (rejecting defense of acquiescence where defendant provided no proof of substantial expansion of trade during six month period of alleged acquiescence); *Ronda Ag v. Harley–Davidson, Inc.*, 1997 WL 85809 * 3 (Fed.Cir. Feb.27, 1997) (rejecting laches defense where evidence showed merely "business as usual" for the defendant during four and a half year delay, as opposed to increases in sales or promotional expenditures, or substantial growth in trade). While the Court does not hold that there are no circumstances in which an increase in a defendant's geographic market could be so dramatic as to constitute progressive encroachment,[7] the further expansion of an already multi-state market as occurred in this case is insufficient.

Moreover, the changes in the defendant's mark over the years have actually decreased, rather than increased, the similarities between it and the plaintiff's mark, as the name on the defendant's labels has evolved from "Johnny's" and "Johnny's Gourmet" to "Johnny Fleeman's Gourmet." Even in March 2001, when Mr. Fleeman was contacted by counsel for the plaintiff, his mark was no more similar to the plaintiff's than it had been at the time

of the plaintiff's acquiescence in 1997. Based on the facts presented in this case, the Court finds the plaintiff's progressive encroachment theory to be without merit.

### C. Inevitability of Confusion

Having found that the plaintiff acquiesced to the defendant's use of the "Johnny's" mark, the Court must consider whether and to what extent the plaintiff is bound by that acquiescence.

Courts are mindful in this context that the paramount interest at stake in trademark cases does not belong to either the plaintiff or the defendant, but is that of the public in avoiding confusion over the source of goods in the marketplace. *Coach House Restaurant Inc.*, 934 F.2d at 1564. Accordingly, there is precedent elsewhere for reviving a claim for injunctive relief, otherwise barred by acquiescence, where the use of a particular mark presents not just a likelihood of confusion, but an inevitability of confusion. *Id.*; *SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir.1996).

Absent estoppel by acquiescence, the critical determination in a trademark case such as the one presented here would usually be whether the defendant's label is *likely* to cause confusion or deception regarding its origin. Factors to be considered in making that determination include: 1) strength of plaintiff's mark; 2) relatedness of the parties' goods; 3) similarity of the designs; 4) evidence of actual confusion; 5) marketing channels used; 6) likely degree of purchaser care; 7) defendant's intent in selecting the design; and 8) likelihood of expansion of the product lines.

---

7. Where, for example, a defendant's use of a mark expands beyond its long-time use in a single city, a plaintiff who has acquiesced to such previous use may rightfully object to the defendant's expansion to other areas. *See*

*Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152 (5th Cir.1985); *King Bearings, Inc. v. King Bearing, Inc.*, 882 F.Supp. 630, 632–33 (W.D.Ky.1994).

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982).

The defendant concedes the strength of the plaintiff's "JOHNNY'S" and "JOHNNY'S LIGHT" marks as incontestable registered trademarks, as well as the relatedness of the goods, and overlap in marketing channels. Further, it is apparent that the purchase of the parties' products involve a relatively low degree of purchaser care. These factors would weigh in favor of the plaintiff in the typical analysis, and do so to a lesser extent here.

The defendant has expanded its distribution in recent years, and also competes nationally with the plaintiff through its internet sales. While Mr. Fleeman did not actually intend to trade on the plaintiff's goodwill by using his own name on his product, he did continue to use the name after being made aware of its use as a registered trademark by the plaintiff on similar products. Under normal circumstances, these factors would weigh in favor of the plaintiff. In this case, however, the defendant took all these actions with the tacit permission of the plaintiff's predecessor, who had actively noted the defendant's use of the "Johnny's" mark and explicitly limited his objection to the format of the defendant's coupons. Accordingly, these factors do not weigh in favor of either party.

■■■ A key issue in this analysis is the similarity of the marks currently in use. The similarity between particular marks is a question of fact. *Daddy's Junky Music Stores v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 284 (6th Cir.1997). At various points in time it appears that the defendant has made use of the marks "Johnny's," "Johnny's GOURMET," "Johnny Fleeman's" and "Johnny Fleeman's GOURMET." The Court's current analysis, however, is limited to the facts relevant to the issuance of an injunction against *future* actions; the Court shall only consider, therefore, the marks presently being used by the defendant.

As of July, 2001, all of the defendant's new product has been labeled with the mark "Johnny Fleeman's" or "Johnny Fleeman's GOURMET."[8] The mark appears in all cases to be prominently featured at the top center of the label, with each word of the mark on a separate horizontal line. Both "Johnny" and "Fleeman's" have initial capitalization only, and appear in slightly italicized font of the same size, notably larger than that of the actual product description (i.e. "HONEY MUSTARD DRESSING," etc.) or the rest of the label. The word "GOURMET" is fully capitalized in block letters, and almost always directly below "Fleeman's" in a ribbon banner; in at least one instance, it appears in a shield-type emblem.[9] All of the defendant's labels are black with predominantly white print.

In comparison, the plaintiff's labels are not nearly as uniform. (See product labels pictured in Plaintiff's Exhibit 33). It appears that in most cases the "Johnny's"

---

**8.** It is undisputed that product under the old label remained on shelves and continued to be shipped from the defendant's warehouse until those supplies were depleted. Although the Court understands the plaintiff's frustration with the length of time during which the defendant's "Johnny's" designation remained in the marketplace as a result of reliance on attrition to replace the product, the evidence that the old product remained available at least into 2002 does not prevent the Court from crediting Mr. Fleeman's testimony about the date on which he began labeling his new product with his new labels.

**9.** See "Johnny Fleeman's GOURMET STEAK SAUCE and SEASONING," Defendant's Exhibit 40; also pictured in Plaintiff's Exhibit 40.

mark is featured at the top center of a label, in block letters, with a leaf design incorporated near the "J," although the mark frequently appears at different locations and in different sizes and lettering styles depending on the product. The product names (e.g. "GREAT CAESAR," "JAMAICA MISTAKE," etc.) are frequently featured in much larger print than the "Johnny's" mark, and the plaintiff's labels do not employ a uniform color scheme.

 The appearance of the parties' products is thus plainly distinct, particularly when taken in their totality. The true test of the possibility of confusion, however, is not in a side-by-side comparison of the products, but in whether a consumer with only a vague notion or recollection of the product line he seeks would be confused by encountering one without the other. *See Jet, Inc. v. Sewage Aeration Sys.,* 165 F.3d 419, 423 (6th Cir.1999). In light of the plaintiff's previous acquiescence to the defendant's use of the "Johnny's" mark, the inquiry here is not whether such confusion is possible or even likely, but whether it is inevitable. The Court finds that the marks "Johnny Fleeman's" or "Johnny Fleeman's GOURMET" are not so similar to "Johnny's" or "Johnny's LITE" that confusion between the products is inevitable. The plaintiff has argued correctly that simply adding a modifier to another entity's entire mark does not eliminate the possibility of confusion, and if the defendant were still using the mark "Johnny's" by itself or simply with the modifier "GOURMET," that argument would be relevant. The Court finds that the addition of the surname "Fleeman's," however, does more than merely add a descriptive term to the mark; it substantively transforms it into a separate and distinct mark.

 This mark also happens to be a personal name, the use of which on an individual's goods was historically considered to be "a personal and inalienable birthright," and which even now is enjoined only to the extent actually necessary to prevent confusion. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 124 (4th Cir.1990); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1288–89 (9th Cir.1992); *M. Fabrikant & Sons. Ltd. v. Fabrikant Fine Diamonds, Inc.,* 17 F.Supp.2d 249 (S.D.N.Y.1998) (enjoining seller from using his surname "Fabrikant," which was registered trademark owned by plaintiff, unless it was preceded by seller's first name in same size, color, type and conspicuousness).

The plaintiff has argued that the addition of Mr. Fleeman's surname is insufficient to avoid confusion, because the public tends to adopt abbreviated versions of lengthy product names. While this has been found to be true when a mark consists of a root term and qualifying words, *Daddy's Junky Music Stores, Inc.* at 283, that is not the case with the defendant's current mark. "Fleeman's" is not merely a qualifier or modifier likely to be dismissed or ignored by the public, but is a crucial part of a distinct name likely to be taken as a whole. In this way it is very different from the plaintiff's "Johnny's Fine Foods," which Mr. Szybura, president of the plaintiff company, testified is routinely shortened to "Johnny's." While the defendant's modifier "GOURMET" is as likely to be dropped in common parlance as the plaintiff's "Fine Foods," that still leaves the distinct "Johnny Fleeman's" to distinguish the defendant's wares from the plaintiff's.

As evidence of the propensity to shorten the defendant's mark to "Johnny's," the plaintiff points to a grocery store receipt on which the defendant's product is referenced as "JHNYS SAUCE." (Plaintiff's Exhibit 42). Mr. Crabill, the chief executive officer of the plaintiff company, ac-

knowledged that he has no information about the defendant's ability or lack thereof to control the way a grocery store "rings up" its products. More importantly, a grocery store's abbreviation of a product name to the absolute minimum in order to fit onto a narrow receipt is no indication of any confusion on the part of the store and is imminently unlikely to serve as a source of confusion for the public. There is simply no evidence before the Court establishing a significant risk that the public will haphazardly shorten "Johnny Fleeman's" to "Johnny's" any more than "Orville Redenbacher's" is known as "Orville's" or "Sara Lee" is known as "Sara," which is rarely or never.

■ In order for this to remain true, however, it is important that the defendant's product be consistently held out as "Johnny Fleeman's" or "Johnny Fleeman's GOURMET." The Court finds that the defendant's use of the "Johnny's" mark, alone or in combination with "GOURMET," on nearly identical products in the same areas and marketing channels, would indeed lead to inevitable confusion by the public between the parties' products. Accordingly, this aspect of the plaintiff's suit is revived from acquiescence, and any and all such use shall be enjoined.

■ The plaintiff has also cited evidence of a few cases of confusion between the products. The first such example was the 1997 attempt by a coupon clearinghouse to redeem the defendant's coupons with the plaintiff, as discussed above, a mistake that has continued sporadically in the intervening years. Although the Court doubts that a coupon clearinghouse constitutes a marketplace in which confusion is relevant for the purpose of trademark infringement analysis, it accepts this evidence to the extent that such confusion may be minimally indicative of the possibility of confusion in other contexts. Even for that purpose, however, the Court con-

cludes that a handful of mistakes at a clearinghouse in the course of regularly handling a huge volume of coupons does not evidence any significant confusion there or risk of confusion elsewhere. This is particular true where both Mr. Szybura and Mr. Fleeman testified to the effect that they also occasionally receive coupons from totally unrelated companies as the result of clearinghouse mistakes.

The plaintiff also complains about confusion at trade shows and among distributors, which comprise a relevant market for the parties' goods. *See Reed v. Amoco Oil Co.*, 611 F.Supp. 9, 13 (M.D.Tenn.1984). This confusion includes such instances as misdelivery of the plaintiff's trade show supplies to the defendant's exhibit, intermingling of the parties' products on a distributor product listing, and questions from distributors about each other's products. This confusion on the part of the distributors of the parties' goods weighs in favor of the plaintiff, and appears to arise from the distributors' reliance on the parties' corporate names (Johnny's Fine Foods, Inc. and Johnny's, Inc.) in referring to their respective brands, and from instances when the defendant has registered with trade shows or associations under the name "Johnny's GOURMET." This evidence supports the Court's conclusion that such use of "Johnny's" by the defendant inevitably leads to confusion, and these opportunities for confusion should be eliminated by the injunction to be issued.

The only evidence of actual confusion by end consumers of the parties' products are an e-mail to the defendant asking whether the two companies were affiliated; a telephone call to the defendant asking if it had changed its honey mustard recipe after purchasing the plaintiff's product; a telephone call to the defendant asking about his dry seasoning or rub, a product offered by the plaintiff, but not the defendant; and

an e-mail to the plaintiff about difficulty finding honey mustard dressing with black label and yellow writing, presumably the defendant's product. Although this evidence would normally favor the plaintiff, it may very well arise from the period of time during which the defendant was actively holding itself out as "Johnny's" and "Johnny's GOURMET," and clearly includes the period during which the defendant's "Johnny's" labels remained in the marketplace.

For example, although the e-mail to the plaintiff about the honey mustard dressing is dated August 5, 2002, the sender indicates that he bought the product at some unspecified time in the past "while living in Nashville." (Plaintiff's Exhibit 45). Given that the defendant's products were still being labeled as "Johnny's GOURMET" until July 2001, and that stock of previously-labeled product continued to be shipped through November 2001 (see Plaintiff's Exhibit 247, p. 11), the Court finds it much more likely that the consumer who sent the e-mail had purchased and been confused by a product bearing the "Johnny's GOURMET" label rather than the more recent "Johnny Fleeman's GOURMET." Accordingly, the Court puts very little weight on these few undated examples of confusion for the purpose of determining whether the defendant's current mark will inevitably be confused with that of the plaintiff.

Finally, the plaintiff has particularly complained about the defendant's use of the "Johnny's" mark on the internet, both in the defendant's domain name and as a metatag.[10] These terms require some definition. As the Sixth Circuit has explained, each website on the internet has a domain name, "which is an identifier somewhat analogous to a telephone number or a street address." *Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.,* 326 F.3d 687, 691 (6th Cir.2003). Entering a website's domain name into a web browser is the most direct means of retrieving that particular website.[11] The domain name serves to identify the source of a website, in much the same way that a corporate name or logo on a product identifies the source of that product. In this case, despite adopting the new "Johnny Fleeman's" and "Johnny Fleeman's Gourmet" logos, the defendant continues to utilize the "johnnysgourmet.com" domain. For the same reasons that the use of "Johnny's GOURMET" on the defendant's product labels would inevitably lead to confusion between the parties' products, the use of the defendant's current domain name is equally likely to confuse. Moreover, this confusion will not be limited to internet users, but will potentially affect shoppers who examine the defendant's labels and find the "johnnysgourmet.com" domain featured there. Accordingly, the Court is specifically including within its injunction the defendant's use of "Johnny's" alone or "Johnny's GOURMET" within its internet domain.

An internet metatag is very different from a domain name. When an internet user, or "surfer," is looking for a particular website but does not know the site's domain name, he or she may use one of several available internet search engines to locate the site. The surfer enters one or more keywords about the site into the search engine, and the engine compares

10. The plaintiff also objected to the use of "Johnny's" alone and "Johnny's GOURMET" in reference to the individual products featured on the defendant's website; Mr. Fleeman testified that those had been corrected to conform with his new label logos by the time of trial.

11. For a more detailed description of the operation of domains and metatags, see *Interactive Products* at 691–92.

the surfer's keywords against domain names, text and metatags for websites known to the engine, and offers the surfer a list of websites from which he may choose. Metatags are code hidden within a website, invisible to viewers, for the purpose of describing the site's content and increasing the likelihood of retrieval by search engines. The deceptive use of another company's trademark as a metatag, in order to lure a surfer into a competitor's website constitutes impermissible trademark infringement. *E.g., Victoria's Secret Stores v. Artco Equipment Co., Inc.*, 194 F.Supp.2d 704 (S.D.Ohio 2002). However, the fact that the use of a mark in a domain name is likely to cause confusion does not automatically mean that its use as a metatag is likely to cause such confusion. *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 258 (6th Cir.2003). Rather, the Court must determine how likely it is that a potential consumer will be confused by retrieving a list containing both parties' websites after searching for the keyword "Johnny's."

In this case, however, the plaintiff has not introduced any evidence on this issue to analyze. It is not even absolutely clear that the defendant has adopted the term "Johnny's" as a searchable metatag for its website. To the contrary, Mr. Fleeman testified at trial that he was not clear on how metatags are set up, and despite having been provided with the name, address and telephone number of the individual responsible for designing and coding the defendant's website (see Plaintiff's Exhibit 247, p. 10), the plaintiff has not offered any testimony from that individual to support its claims. As explained above, to the extent that the same internet search may retrieve the websites of both parties, that could be the result of the term "Johnny" appearing in the domain name or text of the sites, rather than its use as a metatag.

Moreover, even assuming that the defendant has employed the term "Johnny's" as a metatag for its website, that term is so generic and ubiquitous on the internet that any additional confusion caused by its use by both of these parties would be negligible at best. For example, a search conducted on the two most popular search engines, Google and Yahoo, for the keyword "johnny's" will retrieve a list of either 157,000 or 251,000 options of websites featuring everything from vegetable seeds to Irish pubs to military music lyrics. Even adding the additional keyword "sauce" will result in a list of either 2,850 or 4,440 websites. With either search, the plaintiff's website is ranked fifth among all options, while the defendant's site does not even appear on the first page of results. Similar results are obtained by substituting the keyword "dressing" or "seasoning," and even by searching for "johnny's gourmet"—the very words used in the defendant's offending domain name—the surfer will retrieve either 3,940 or 6,070 websites, with the plaintiff's site ranked higher than the defendant's in both cases.

The Court hardly sees how any the use of "Johnny's" as a metatag for the defendant's website could add significantly to this confusion. Absent any evidence to the contrary from the plaintiff, the Court finds that the alleged metatag use does not render confusion between the parties or their products inevitable.

### III. CONCLUSION

For the reasons stated above, the Court finds for the defendant on the plaintiff's suit for damages. The Court finds for the plaintiff in part on the plaintiff's request for injunctive relief, and orders that the defendant is enjoined from any and all use of the term "Johnny's" or "Johnny's Gourmet" in reference to itself or its products in any context capable of being observed

by customers (including distributors) or consumers of the parties' goods, including, but not limited to, the defendant's corporate name, labels, coupons, recipes, advertisements and websites (including domain and text). To whatever extent the defendant currently has products, coupons, media or internet advertisements, trade group memberships or trade show registrations employing the term "Johnny's" alone or "Johnny's GOURMET," in any context, compliance with this injunction shall require the defendant to take all reasonable steps necessary to retrieve such items or correct such membership or registration designations.

An appropriate order shall be entered.

## ORDER

In accordance with the memorandum contemporaneously entered, the Court finds for the plaintiff in part on the plaintiff's request for injunctive relief, and orders that the defendant is hereby enjoined from any and all use of the term "Johnny's" alone or "Johnny's Gourmet" in reference to itself or its products in any context, including, but not limited to, corporate name, product labels, coupons, recipes, advertisements and websites (including domain and text). The defendant is ordered to take whatever reasonable steps are necessary to remove any offending products or other designations currently in the marketplace or trade industry.

In all other respects, the Court finds in favor of the defendant.

Entry of this order shall constitute the judgment in this action.

It is so ORDERED.